**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1540**

ESIN E. ARAKAS,

                Plaintiff - Appellant,

      v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

                Defendant - Appellee.

Appeal from the United States District Court for the District of South Carolina, at Florence. Timothy M. Cain, District Judge. (4:17−cv−02338−TMC)

Submitted: September 11, 2020             Decided: December 14, 2020

Before GREGORY, Chief Circuit Judge, and WYNN and HARRIS, Circuit Judges.

Reversed and remanded by published opinion. Judge Wynn wrote the opinion, in which Chief Judge Gregory and Judge Harris joined.

**ON BRIEF:** Robertson H. Wendt, Jr., FINKEL LAW FIRM, LLC, North Charleston, South Carolina; Sarah H. Bohr, BOHR & HARRINGTON, LLC, Atlantic Beach, Florida, for Appellant. Eric Kressman, Regional Chief Counsel, Victor Pane, Supervisory Attorney, Annie Kernicky, Special Assistant United States Attorney, Corey Fazekas, Office of the General Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania; Sherry A. Lydon, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

WYNN, Circuit Judge:

Plaintiff Esin Arakas appeals from the district court's order affirming the Social Security Administration's denial of her application for disability insurance benefits. Arakas argues that the administrative law judge ("ALJ") made several errors in discrediting her subjective complaints of pain and fatigue and in according little weight to the opinion of her treating physician.

We agree that the ALJ erred and conclude, based on our review of the record, that Arakas was legally disabled during the relevant period. Accordingly, we reverse and remand for a calculation of disability benefits.

I.

On April 23, 2010, Arakas filed an application for Social Security Disability Insurance ("SSDI") benefits, alleging disability based on various conditions including fibromyalgia, carpal tunnel syndrome, and degenerative disc disease. After her claim was denied initially in 2010 and upon reconsideration in 2011, she requested a hearing, which was held on June 15, 2012 before an ALJ. Arakas originally alleged that her disability began on November 11, 1996, but she later amended the onset date to January 1, 2010.

On August 28, 2012, the ALJ denied Arakas's claim. The Social Security Administration ("SSA")'s Appeals Council summarily denied review. Arakas then filed suit in the United States District Court for the District of South Carolina pursuant to 42 U.S.C. § 405(g).

On September 23, 2015, the district court reversed and remanded the case, instructing the Commissioner to make findings of fact regarding an opinion letter submitted

3

to the Appeals Council by Dr. Frank Harper, Arakas's long-time treating physician, in support of her application. *See Arakas v. Colvin*, No. 4:14-CV-457-TER, 2015 WL 5602577, at *6–7 (D.S.C. Sept. 23, 2015). Accordingly, the Appeals Council ordered a remand, and another ALJ held a second hearing on February 24, 2017. That ALJ again denied Arakas's claim.

On August 31, 2017, Arakas commenced the instant suit in the District of South Carolina. On January 24, 2019, a magistrate judge issued a Report and Recommendation, which recommended affirming the Commissioner's decision.

On February 6, 2019, Arakas filed objections to the magistrate judge's conclusions that the ALJ's findings regarding her fibromyalgia and subjective complaints were made through proper analysis and supported by substantial evidence. On March 21, 2019, the District Court adopted the magistrate judge's Report and Recommendation and affirmed the Commissioner's decision. *See Arakas v. Berryhill*, No. 4:17-CV-02338-TMC, 2019 WL 1292458, at *5 (D.S.C. Mar. 21, 2019). Arakas timely appealed.

## A.

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, ALJs use the "five-step sequential evaluation process" set forth in 20 C.F.R. § 404.1520(a)(4).

At step 1, the ALJ must determine whether the claimant has been working. 20 C.F.R. § 404.1520(a)(4). Step 2 asks whether the claimant's medically determinable impairments meet the regulations' severity and duration requirements. If the claimant has been working, or if the claimant's impairments do not meet the severity and duration requirements, the ALJ must find the claimant not disabled. *Id.* Otherwise, the ALJ proceeds to step 3— determining whether any of the claimant's impairments, independently or in combination, meets or equals an impairment listed in the regulations, in terms of severity. If any of the claimant's impairments matches a listed impairment, the claimant is disabled. *Id.*

If unable to make a conclusive determination at the end of step 3, the ALJ must then assess the claimant's Residual Functional Capacity, which is the most work-related activity the claimant can do despite all of her medically determinable impairments and the limitations they cause. *See Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015); 20 C.F.R. § 404.1545(a). To assess the claimant's Residual Functional Capacity, the ALJ must first identify the claimant's "functional limitations or restrictions" and assess the claimant's "ability to do sustained work-related" activities "on a regular and continuing basis"—*i.e.*, "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The ALJ may then express the claimant's Residual Functional Capacity "in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy." *Id.*

After the Residual Functional Capacity assessment, the ALJ proceeds to step 4, which asks whether the claimant can still perform past relevant work despite the limitations

identified. 20 C.F.R. § 404.1520(a)(4). If the claimant is capable of doing so, she is not disabled. *Id.* Otherwise, the ALJ proceeds to step 5.

At this final step, the ALJ must determine whether the claimant can perform other work considering her Residual Functional Capacity, age, education, and work experience. *Id.* Here, the ALJ typically relies on a vocational expert's testimony. *Mascio*, 780 F.3d at 635. If able to perform other work, the claimant is not disabled. If unable, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4).

The burden of proof lies with the claimant during the first four steps but shifts to the Commissioner at step 5. *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).

## B.

Arakas was 50 years old when she first applied for disability insurance benefits in 2010. She has a high school degree, and she completed specialized job training in real estate sales in 2005. Between 1997 and 2009, Arakas worked full-time as a dining room manager at a restaurant. She has also worked briefly as a real estate salesperson and a caterer. Due to her alleged disability, Arakas stopped working full-time as of January 1, 2010, although she performed some part-time work for a catering company in 2010 and as a cashier at a restaurant in 2017.

## 1.

For many years, Arakas has suffered from several medical conditions that limit her ability to perform gainful work activity. The most significant is fibromyalgia, "a disorder of unknown cause" characterized by "chronic widespread soft-tissue pain" particularly in "the neck, shoulders, back, and hips, which is aggravated by use of the affected muscles"

and "accompanied by weakness, fatigue, and sleep disturbances." Stedman's Medical Dictionary 331870 (2014). Fibromyalgia "symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).

Dr. Harper, a rheumatologist, treated Arakas for her fibromyalgia and other pain-causing conditions from November 11, 1996 to February 24, 2017. In 1996, Dr. Harper diagnosed her with fibromyalgia, based on his findings of "exquisitely tender trigger points" throughout her neck and shoulder muscles, hips, knees, and upper, mid, and lower back—"in accordance with the diagnostic criteria of the American College of Rheumatology." A.R. 357–58, 502.[1] He found no other abnormalities, such as muscle weakness, abnormal reflexes, or limited range of motion—a finding consistent with fibromyalgia.

Dr. Harper's treatment notes indicate that since 1996, Arakas has suffered from chronic, diffuse myalgias (muscle pain), stiffness, and fatigue—particularly in her neck, back, hips, and legs—with waxing and waning severity. He observed that physical exertion and lack of sleep aggravated her symptoms. He also consistently noted that she showed a full range of motion of the joints and no signs of active joint inflammation, both of which are typical of fibromyalgia. Over the years, Dr. Harper prescribed physical therapy and various medications for Arakas's fibromyalgia, including antidepressants that help control neuropathic pain (imipramine and Cymbalta) and narcotic painkillers (Darvocet and

---

[1] Citations to "A.R. __" refer to the administrative record in this case.

7

Lorcet/Lortab). He also provided tender-point injections and referred her for a cervical epidural block when her pain symptoms were severe.

For many years, Arakas has also suffered from degenerative disc disease in her cervical spine, which has caused persistent and often severe neck and shoulder pain. She was diagnosed with the condition in 2009 based on an MRI, which showed hypolordosis (loss of the normal curve) of the cervical spine, bulging discs, and mild right foraminal narrowing (tightening or narrowing of the small openings along the spine that nerves pass through). Dr. Charles Jervey, a neurologist who examined Arakas after Dr. Harper's referral, found tenderness in her neck and considerable tightness of the right posterolateral muscles, as well as signs of cervical dystonia (muscle spasm). Over the years, Dr. Harper also documented severe pain, muscle spasms, and tenderness in Arakas's neck and shoulder muscles caused by degenerative disc disease. According to Arakas, medications offered minimal relief, and daily activities tended to aggravate the pain.

In 2007, Arakas was diagnosed with carpal tunnel syndrome in both hands—more severe in the right (her dominant hand)—after an electrodiagnostic study. She complained of stiffness, pain, swelling, and numbness in her right hand, and stated that she could not, at times, bend her fingers enough to type on the computer. Dr. David Everman, who made the diagnosis, injected her right carpal tunnel. In February 2015, Dr. Harper also documented Arakas's carpal tunnel syndrome symptoms and prescribed regular use of wrist splints. Sometime between 2010 and 2012, Arakas also developed osteoarthritis in her extremities, which has exacerbated the pain in her hands.

While fibromyalgia, degenerative disc disease, and carpal tunnel syndrome have been the primary sources of Arakas's symptoms, she has also suffered from other pain-causing conditions such as bursitis in her right shoulder and internal knee derangement.[2]

2.

During the course of Arakas's SSA proceedings, Dr. Harper provided three opinion letters in support of her application. In June 2012, he submitted an opinion letter to the agency, explaining that Arakas had been "under [his] care for many years carrying the diagnosis of fibromyalgia syndrome." A.R. 502. Based on his observations and findings, he opined that Arakas had been "unable to sustain full-time work activity of 8 hours per day, 5 days a week . . . since January 2010." *Id.*

After an ALJ denied Arakas's claim in August 2012, Dr. Harper provided another opinion letter in November 2012 in support of her appeal. He emphasized that fibromyalgia typically did not produce laboratory abnormalities, disagreeing with the ALJ's reliance on the lack thereof. He also explained that degenerative disc disease and carpal tunnel syndrome were "comorbid conditions which aggravate[d] long-standing fibromyalgia" and that Arakas's cervical MRI showed "clear evidence of chronic cervical spasm . . . associated with chronic pain that ha[d] been so disabling for the patient." A.R. 503. In addition, he noted that fibromyalgia was associated with chronic cognitive dysfunction and that prescription medications required for treatment also impaired her concentration—both

---

[2] The administrative record contains Arakas's treatment records from other medical providers. We do not discuss those records here as they mostly concern medical issues unrelated to Arakas's alleged disability.

9

of which prevented her from sustaining an 8-hour workday. Based on his observations and medical findings, Dr. Harper again opined that despite many attempts at intervention, Arakas had been unable to "sustain work even at a light exertional level full time since January of 2010." *Id.*

Finally, in 2017, Dr. Harper submitted an opinion letter in support of Arakas's second ALJ hearing. He again described the chronic pain and fatigue caused by Arakas's fibromyalgia and stressed her inability to sustain work activity.

3.

As part of SSA's disability determination process, multiple state agency consultants provided assessments of Arakas's physical and mental limitations. On December 2, 2010, Dr. William Cain, a non-examining medical consultant, evaluated Arakas's physical Residual Functional Capacity based on his review of her medical records available at the time. He concluded she had "the required findings for fibromyalgia" but could still perform the following functions: lifting 20 pounds occasionally and 10 pounds frequently; standing, walking, or sitting for 6 hours in an 8-hour workday; pushing or pulling with no limits; occasionally stooping, kneeling, crouching, crawling, or climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; and frequently balancing. A.R. 410–13. Upon reconsideration in March 2011, Dr. Tom Brown, another non-examining medical consultant, concurred with Dr. Cain's conclusions.

In 2010 and 2011, respectively, state agency consultants Jonathan Simons, Ph.D., and Kathleen Broughan, Ph.D., assessed Arakas's psychological condition and limitations. Each psychologist found that Arakas suffered from non-severe impairments, including

10

mild depression, which would not affect her ability to work. Notably, the evaluations also suggested that chronic pain and fatigue produced by fibromyalgia could be causing Arakas's depression and her problems with attention and concentration, and that her fibromyalgia might interfere with her ability to work full-time.

4.

Arakas's testimony at her two ALJ hearings offers additional insight as to the severity, persistence, and limiting effects of her fibromyalgia and other medical conditions.

At her first ALJ hearing in 2012, Arakas testified that she suffered from severe neck pain and could not sleep without a neck brace. She detailed the constant pain she experienced in her neck, shoulders, legs, hips, feet, ankles, and knees, and described the pain in her lower body as an "extreme deep burn"—as if someone was sticking a searing iron down in her bone. A.R. 52. Lifting, writing, and sitting in one position for 45 minutes or longer aggravated the pain. She reported that the heaviest amount of weight she could lift was a gallon of milk. She had difficulty buttoning her blouse or picking up a coin or a paper clip from a table, and when her pain symptoms became aggravated, she could not even lift a gallon of milk or write her name with a pen. She wore a wrist brace on her right hand at all times due to the pain.

Arakas further testified that her pain waxed and waned, but that she experienced periods of flare-ups that could recur on and off for at least half a month, with each flare-up lasting up to a week. During flare-ups, the pain was bad enough to miss work, and she had trouble concentrating due to brain fog. She had tried different medications but did not react well to some, including Lortab. Although she had to take Lortab at times to control her

11

severe pain, the side effects made it difficult to stay alert and made her groggy. She did not experience any significant improvement from treatment.

Finally, Arakas testified about how her symptoms limited her ability to perform daily activities. Although she tried to do housework whenever possible and would dust the house if feeling up to it, she relied heavily on her daughter, who lived with her. And while she could go grocery shopping once a week if her symptoms were mild, she did not cook much, as standing and cutting were difficult. She attended church once a week, but sitting for 45 minutes was very difficult at times. She tried to walk in the mornings, maybe twice a week if possible, but afterward, she would be "done for the rest of the day." A.R. 59.

Arakas again testified at the second ALJ hearing in 2017. She relayed that in the few months prior to the hearing, she had been helping out at her sister-in-law's restaurant as a cashier for four hours or more per week. While working at the restaurant, she had trouble using her right hand, and she had to wear a wrist splint and be very slow because she could not feel the money. She was unable to work full-time due to pain and overwhelming fatigue. Her symptoms had worsened since the 2012 hearing.

Arakas testified that she experienced pain all over, including in her thighs, feet, back, neck, and right hand, and that she had trouble going up and down stairs. She had difficulty sitting and could remain standing for two hours at most. She took Ibuprofen for pain, as narcotic painkillers caused poor concentration and grogginess. She could take care of personal needs, such as showering and dressing, but had to cut her hair because drying it was too difficult. As for household tasks, she had "learned to let go [of] a lot of things" and her ability to do chores depended on her symptoms. A.R. 533. Mopping and vacuuming

12

were difficult. She tried to get up early and go for a walk as part of her therapy, but she had to turn around and go home at times due to burning in her legs and fatigue. After noon, she could hardly do anything due to her symptoms.

C.

After reviewing the evidence in the record, the ALJ who presided over the 2017 hearing concluded that Arakas was not disabled during the relevant period (January 1, 2010 to December 31, 2014) and denied her claim for disability insurance benefits. The ALJ found at steps 1 and 2 that Arakas did not engage in substantial work activity during the relevant period, and that she suffered from the severe medical impairments of fibromyalgia and degenerative disc disease. At step 3, the ALJ determined that none of Arakas's impairments met or equaled one of the impairments listed in the SSA regulations.

The ALJ then proceeded to assess Arakas's Residual Functional Capacity. He determined that despite her impairments, she retained the ability to perform light work[3] with the following restrictions: no climbing ladders or scaffolds; occasional stooping, kneeling, crouching, crawling, and climbing ramps or stairs; frequent balancing; and no exposure to work hazards. In reaching this conclusion, the ALJ found that Arakas's

---

[3] "Light work" is defined in 20 C.F.R. § 404.1567(b):

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities.

subjective complaints regarding the severity, persistence, and limiting effects of her symptoms were "not reliable" and not "completely consistent with the objective evidence." A.R. 514–15. The ALJ also questioned the credibility of Dr. Harper's opinions and accorded "little weight" to them while assigning "significant weight" to the state agency consultants' opinions. *Id.*

Based on the Residual Functional Capacity assessment, the ALJ concluded that Arakas was capable of performing her past relevant work as a dining room manager, which the vocational expert described as light work, and thus that she was not disabled.

## II.

We uphold a Social Security disability determination if (1) the ALJ applied the correct legal standards and (2) substantial evidence supports the ALJ's factual findings. *See Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015); 42 U.S.C. § 405(g).

"In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment" for the ALJ's. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Yet even under this deferential standard, we do not "reflexively rubber-stamp an ALJ's findings." *Lewis*, 858 F.3d at 870. To pass muster, ALJs must "build an accurate and logical bridge" from the evidence to their conclusions. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

## III.

Arakas contends that the ALJ erred by failing to properly assess her subjective complaints of pain and fatigue. Specifically, she argues that: (1) the ALJ applied an

incorrect legal standard when he discounted her complaints as inconsistent with the objective medical evidence; and (2) substantial evidence does not support the ALJ's other findings related to her subjective complaints.

We agree with Arakas on both points. A close examination of the ALJ's decision reveals not only errors of law and fact, but also a failure to understand and consider the unique nature of fibromyalgia.

## A.

When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.

Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. *See* 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." *Id.* at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. *Id.* at *5.

15

The Fourth Circuit "has battled the [Commissioner] for many years over how to evaluate a disability claimant's subjective complaints of pain." *Lewis*, 858 F.3d at 865 (alteration in original) (quoting *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994) (Hall, J., concurring)). In fact, the two-step process that SSA uses to evaluate symptoms was born out of a long history of disagreements between this Court and the agency over this very issue. *See Hines v. Barnhart*, 453 F.3d 559, 564–65 (4th Cir. 2006). Since the 1980s, we have consistently held that "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *see also Craig*, 76 F.3d at 592–93; *Hines*, 453 F.3d at 563–65. Rather, a claimant is "entitled to rely exclusively on subjective evidence to prove the second part of the test." *Hines*, 453 F.3d at 565.

Here, the ALJ disregarded this longstanding precedent and the agency's own policy by improperly discounting Arakas's subjective complaints of pain and fatigue, based largely on the lack of objective medical evidence substantiating her statements. The ALJ concluded that Arakas's medically determinable impairments "could reasonably be expected to cause some of the alleged symptoms," thus satisfying the first step of the symptom-evaluation framework. A.R. 513.

But at the second step, the ALJ improperly discredited Arakas's statements about the severity, persistence, and limiting effects of her symptoms because he did not find them to be "completely consistent with the objective evidence." A.R. 513, 515. In doing so, he emphasized that the doctors' reports "fail[ed] to reveal the type of significant clinical and

16

laboratory abnormalities one would expect if the claimant were disabled." A.R. 514. He also repeatedly noted that Arakas's exam results generally showed a "full range of motion of the joints/extremities" and "no signs of active joint inflammation." A.R. 513–14.

Because Arakas was "entitled to rely exclusively on subjective evidence to prove" that her symptoms were "so continuous and/or so severe that [they] prevent[ed] [her] from working a full eight hour day," the ALJ "applied an incorrect legal standard" in discrediting her complaints based on the lack of objective evidence corroborating them. *Hines*, 453 F.3d at 563, 565. Thus, he "improperly increased her burden of proof" by effectively requiring her subjective descriptions of her symptoms to be supported by objective medical evidence. *Lewis*, 858 F.3d at 866.

This type of legal error is particularly pronounced in a case involving fibromyalgia—a disease whose "symptoms are entirely subjective," with the exception of trigger-point evidence, as described below. *Sarchet*, 78 F.3d at 306. "[P]hysical examinations [of patients with fibromyalgia] will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Green-Younger v. Barnhart*, 335 F.3d 99, 108–09 (2d Cir. 2003) (quoting *Lisa v. Sec. of the Dep't of Health & Human Servs.*, 940 F.2d 40, 45 (2d Cir. 1991)); *see also Sarchet*, 78 F.3d at 307 ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced."). But here, the ALJ relied principally on those very results—*i.e.*, a full range of motion and the lack of joint inflammation—in discounting Arakas's complaints as inconsistent with the objective

17

evidence. Thus, he "effectively required 'objective' evidence for a disease that eludes such measurement," which was doubly erroneous. *Green-Younger*, 335 F.3d at 108.[4] And this error was particularly egregious given that Dr. Harper's November 2012 opinion letter had explicitly emphasized that fibromyalgia typically did not produce clinical and laboratory abnormalities.

Moreover, while objective medical evidence is unnecessary at the second step of the symptom-evaluation framework, such objective evidence *was present* in this case. Dr. Harper made "consistent trigger-point findings"—*i.e.*, tenderness in specific sites on the body—which courts have recognized as "objective medical evidence of fibromyalgia." *Brosnahan v. Barnhart*, 336 F.3d 671, 678 (8th Cir. 2003). Indeed, the First Circuit has noted that "trigger points *are* the only 'objective' signs of fibromyalgia." *Johnson v. Astrue*, 597 F.3d 409, 412 (1st Cir. 2010). Whichever way we look at it, the ALJ's error reflects "a pervasive misunderstanding of the disease." *Sarchet*, 78 F.3d at 307.

The Commissioner argues the ALJ did not err because he also considered other evidence. It emphasizes that under 20 C.F.R. § 404.1529(c) and SSR 16-3p, ALJs may not evaluate or reject a claimant's subjective complaints based *solely* on the objective medical evidence or the lack thereof, but may consider such evidence as one of multiple factors.

---

[4] Although no published Fourth Circuit case has yet addressed how fibromyalgia symptoms should be evaluated in SSA proceedings, we have previously held that an ALJ's reliance on the lack of objective medical evidence was improper in other cases where the claimant suffered from a disease that, like fibromyalgia, does not produce symptoms that can lead to such evidence. *See, e.g.*, *Hines*, 453 F.3d at 560–61, 563 (sickle cell disease); *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 272 (4th Cir. 2017) (somatoform disorder).

The Commissioner is correct that the ALJ did also consider other evidence, including Arakas's daily activities. But our review of the record leads us to conclude that the ALJ "effectively required" objective evidence by placing undue emphasis on Arakas's normal clinical and laboratory results. *Green-Younger*, 335 F.3d at 108. And we have previously held that ALJs apply an incorrect legal standard by requiring objective evidence of symptoms even when they also consider other evidence in the record. *See, e.g.*, *Hines*, 453 F.3d at 563, 565–66; *Lewis*, 858 F.3d at 866, 868 n.3.

In his three-page Residual Functional Capacity analysis, the ALJ referred at least five times to the supposed lack of objective medical evidence supporting Arakas's complaints and repeatedly highlighted the ways in which he believed her statements were inconsistent with the objective medical evidence. Particularly telling is his statement that the doctors' reports "fail[ed] to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were disabled." A.R. 514. Thus, while the ALJ may have considered other evidence, his opinion indicates that the lack of objective medical evidence was his chief, if not definitive, reason for discounting Arakas's complaints. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "the nature of fibromyalgia itself renders . . . overemphasis upon objective findings inappropriate").

A growing number of circuits have recognized fibromyalgia's unique nature and have accordingly held that ALJs may not discredit a claimant's subjective complaints regarding fibromyalgia symptoms based on a lack of objective evidence substantiating them. *See, e.g.*, *Johnson*, 597 F.3d at 412, 414 (1st Cir.); *Green-Younger*, 335 F.3d at 108

19

(2d Cir.); *Rogers*, 486 F.3d at 248 (6th Cir.); *Sarchet*, 78 F.3d at 307 (7th Cir.); *Brosnahan*, 336 F.3d at 677–78 (8th Cir.); *Revels v. Berryhill*, 874 F.3d 648, 666 (9th Cir. 2017).

Today, we join those circuits by holding that ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence. Objective indicators such as normal clinical and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease.[5] If considered at all, such evidence—along with consistent trigger-point findings—should be treated as evidence *substantiating* the claimant's impairment. We also reiterate the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.

Because the ALJ's evaluation of Arakas's symptoms was based on an incorrect legal standard as well as a critical misunderstanding of fibromyalgia, we conclude that it was erroneous.

B.

The ALJ's discrediting of Arakas's subjective complaints was not only legally erroneous, but also unsupported by substantial evidence. Specifically, the ALJ erred by (1) selectively citing evidence from the record as well as misstating and mischaracterizing

---

[5] To the extent that our unpublished opinion in *Moore v. Saul*, 822 F. App'x 183 (4th Cir. 2020), can be interpreted to suggest otherwise, today's opinion controls.

20

material facts; (2) finding Arakas's complaints to be inconsistent with her daily activities; and (3) failing to consider fibromyalgia's unique characteristics when reviewing Arakas's medical records. Each of these factual errors undermines the ALJ's conclusion that Arakas was not disabled.

1.

In evaluating a disability claim, "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)).

Arakas argues that the ALJ erred by making "several misstatements of material facts and selectively cit[ing] from the evidence of record." Opening Br. at 30. We agree.

For example, while the ALJ decision stated that Arakas "recently ha[d] been working helping her sister in a restaurant *twice a week for 4 hours a day*," Arakas actually testified that she had been working "*about four hours plus a week*," A.R. 513, 529 (emphases added). The ALJ also omitted Arakas's qualifying statements that she had "a lot of problems using [her] right hand" and "ha[d] to wear [her] wrist brace" while working at the restaurant, as well as that she had to work "very slow[ly]" because she could not "feel the money anymore." A.R. 532.

Similarly, the ALJ stated that "[i]n August 2010, Dr. Harper [had] noted that the claimant [had been] *responding well* to drug therapy." A.R. 513 (emphasis added). But Dr. Harper's August 18, 2010 treatment notes were more nuanced, indicating that Arakas

21

"ha[d] responded to combination drug therapies *reasonably well*, *but ha[d] continued to suffer substantially with breakthrough pain*," A.R. 393. (emphasis added).

Along the same lines, the ALJ asserted that although Arakas "reported significantly worsening pain in her right shoulder and hand in December 2011, she reported improvement in her pain following a steroid injection at her next appointment." A.R. 513. But this characterization did not accurately represent Dr. Harper's April 17, 2012 treatment notes. Dr. Harper recorded that Arakas "did benefit *temporarily* from a Sterapred dosepak"—not an injection—"and d[id] feel *a little better* than she [ha]d [felt] previous visits," but that she nevertheless "continue[d] to experience persistent pain associated with fibromyalgia." A.R. 492. And while the ALJ stated broadly that "Dr. Harper's treatment notes fail[ed] to document . . . complaints of 'brain fog' or decreased concentration," A.R. 513, Dr. Harper's treatment notes from April 26, 2012 and March 29, 2016 in fact indicated respectively that Arakas "ha[d] been unable to concentrate" and had "[d]ifficulty concentrating." A.R. 490, 759.

Finally, the ALJ stated that "[i]n November 2014, Dr. Harper [had] assessed the claimant's fibromyalgia symptoms as moderate." A.R. 513. However, the ALJ failed to mention Dr. Harper's observation from the same day (November 6, 2014) that Arakas's fibromyalgia symptoms were "continued," and also that she "ha[d] developed persistent right shoulder pain, worse with abduction and extension," which made her shoulder movement "markedly restricted." A.R. 765–66. Moreover, the ALJ mischaracterized the severity of Arakas's fibromyalgia symptoms as "moderate" by citing the November 2014

22

assessment in isolation while omitting any mention of Dr. Harper's various treatment notes from the relevant period indicating Arakas's severe or worsening pain and fatigue.

In *Lewis*, we vacated an ALJ decision in part because the ALJ improperly "cherrypick[ed] facts that support[ed] a finding of nondisability." 858 F.3d at 869 (quoting *Denton*, 596 F.3d at 425). For instance, "[i]n the same medical records containing the 'normal' findings relied upon by the ALJ, the physician also noted that Lewis presented with 'stabbing, burning[,] throbbing and tingling, [and] constant pain'" among other symptoms, and that she was "given a steroid injection into her shoulder." *Id.*

Here, the ALJ not only similarly erred by cherry-picking certain facts, but also misstated or mischaracterized other material facts. As a decision based on such errors can hardly be supported by substantial evidence, we cannot uphold the ALJ's disability determination.

2.

The ALJ further erred by discrediting Arakas's subjective complaints as inconsistent with her daily activities. In evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, ALJs may consider the claimant's daily activities. 20 C.F.R § 404.1529(c)(3)(i). But the ALJ's analysis of Arakas's activities was erroneous in two ways. First, he improperly disregarded her qualifying statements regarding the limited extent to which she could perform daily activities. Second, the ALJ failed to adequately explain how her limited ability to carry out daily activities supported his conclusion that she could sustain an eight-hour workday.

"An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018).

In *Woods*, the claimant argued that the ALJ erred in finding her daily activities to be inconsistent with her pain-related complaints. *Id.* We agreed, holding that the ALJ improperly failed to consider the extent to which she could perform those activities. *Id.* at 694–95. Specifically, while "the ALJ noted that Woods c[ould] 'maintain her personal hygiene, cook, perform light household chores,' 'shop,' 'socialize with family members, and attend church services on a regular basis,'" the ALJ failed to account for significant other evidence demonstrating her limited physical capacities. *Id.* at 694. The record included testimony that Woods could not "button her clothes, ha[d] trouble drying herself after bathing, and sometimes need[ed] help holding a hairdryer," and that "it t[ook] her all day to do laundry." *Id.* Moreover, while Woods could "prepare simple meals," she "ha[d] trouble cutting, chopping, dicing, and holding silverware or cups" and "shop[ped] only for necessities," a process that "t[ook] longer than normal." *Id.* at 694–95. Finally, "when [Woods] read[] to her grandchildren, they ha[d] to turn the pages because of severe pain in her hands," and on "some days, she spen[t] the entire day on the couch." *Id.* at 695.

The ALJ evaluating Arakas's case made the same error. He concluded that Arakas had "described activities, including carrying out tasks of independent living, using a computer, performing household chores, driving, shopping, walking for exercise, cooking, making her bed, doing laundry, doing yard work, and painting, which are not limited to the

extent one would expect, given her complaints of disabling symptoms and limitations." A.R. 514. But he failed to account for significant other testimony from Arakas.

Specifically, the ALJ did not mention or address Arakas's testimony that she had difficulty mopping, vacuuming, cooking, cutting, or standing, and that her daughter had to do most of the housework; she had to cut her hair because it was too difficult to dry it; she had trouble buttoning her blouse or picking up a coin or a paper clip from a table; she could not write her name with a pen when her pain symptoms became aggravated; she might go grocery shopping once a week if she was feeling up to it, or otherwise her daughter would go; she tried to walk for exercise but had difficulty due to fatigue and burning pain in her legs; on a good day, she was able to walk for 30 minutes, but after that, she was "done" for the rest of the day; she could not sleep without a neck brace due to pain; she had difficulty sitting through a church service which lasted 45 minutes; and she was too tired to do anything after noon due to her worsening fatigue.

Substantial evidence does not support the ALJ's conclusion that Arakas's subjective complaints were inconsistent with her daily activities, "because the record, when read as a whole, reveals no inconsistency between the two." *Hines*, 453 F.3d at 565. "The ALJ selectively cited evidence concerning tasks which [Arakas] was capable of performing" and improperly disregarded her qualifying statements. *Id.* Thus, he failed to "build an accurate and logical bridge" from the evidence to his conclusion. *Monroe*, 826 F.3d at 189.

The ALJ's analysis of Arakas's activities also suffers from another critical error. SSR 96-8p explains that the Residual Functional Capacity analysis is "an assessment of an individual's ability to do sustained work-related" activities "on a regular and continuing

25

basis"—*i.e.*, "8 hours a day, for 5 days a week, or an equivalent work schedule." 1996 WL 374184, at *1. Even assuming, as the ALJ noted, that Arakas's "daily activities have, at least at times, been somewhat greater than [she] . . . generally reported," A.R. 514, he "provided no explanation as to how those particular activities . . . showed that [s]he could persist through an eight-hour workday." *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 263 (4th Cir. 2017); *see also Woods*, 888 F.3d at 694 (holding that the ALJ erred in failing to explain how the evidence supported his conclusion that the claimant "could actually perform the tasks required by 'medium work'"). Instead, the ALJ merely stated in a conclusory manner that Arakas's activities were "fully consistent" with his Residual Functional Capacity assessment. A.R. 515.[6]

For years, courts around the country have bemoaned the tendency of ALJs to overstate claimants' Residual Functional Capacities and ability to work based on their daily activities. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Nowling v. Colvin*, 813 F.3d 1110, 1122 (8th Cir. 2016); *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014). We too have encountered case after case where an ALJ improperly exaggerated a claimant's Residual Functional Capacity although the claimant could engage in only limited activities. *See, e.g.*, *Brown*, 873 F.3d at 263; *Lewis*, 858 F.3d at 868 n.3.

---

[6] While the ALJ stated that Arakas's part-time work at her sister-in-law's restaurant indicated her ability to maintain some degree of concentration, the record shows that she worked at the restaurant as little as four hours per week. That evidence provides no basis for concluding that she could maintain concentration for *ten times* that amount of time, which full-time work would require.

26

A claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out daily activities. As one of our sister circuits aptly observed, "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson*, 671 F.3d at 647. Furthermore, as we emphasized in *Lewis*, "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Lewis*, 858 F.3d at 868 n.3 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)). Being able to live independently and participate in the everyday activities of life empowers people with disabilities and promotes their equal dignity. In pursuing those ends, disability claimants should not have to risk a denial of Social Security benefits.

If Arakas's qualifying statements are properly considered, it becomes clear that she could perform only minimal daily activities that in no way suggested any ability to engage in full-time work on a sustained basis. *See Rogers*, 486 F.3d at 248 (finding that being able to "drive, clean [the] apartment, care for two dogs, do laundry, read, do stretching exercises, and watch the news" is not comparable to having the ability to perform typical work activities); *Brosnahan*, 336 F.3d at 677 (noting that in a fibromyalgia case, "the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability" to work full-time). Thus, substantial evidence does not support the ALJ's conclusion that Arakas's activities were inconsistent with her subjective complaints but consistent with his Residual Functional Capacity assessment.

27

## 3.

The ALJ's decision also contains other errors based on his failure to understand and properly consider the unique characteristics of fibromyalgia.

SSR 12-2p recognizes that "symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" 2012 WL 3104869, at *6 (July 25, 2012). Accordingly, the Ruling requires ALJs to "consider a longitudinal record whenever possible" when evaluating a disability claim based on fibromyalgia. *Id.*

Here, however, the ALJ failed to appreciate the waxing and waning nature of fibromyalgia and to consider the longitudinal record of Arakas's symptoms as a whole. In explaining his reasons for discrediting Arakas's subjective complaints, the ALJ pointed to Dr. Harper's November 2014 treatment notes, which described her fibromyalgia symptoms as moderate.

Yet this single, isolated assessment of Arakas's symptoms on one particular day does not mean that Arakas's fibromyalgia was moderate generally. Rather, it is necessary to consider the full picture of her symptoms. And indeed, Dr. Harper's notes indicate that at various other times during the relevant period, Arakas experienced "persistent pain associated with fibromyalgia," "intractable cervical pain," "exquisite tenderness," and "a significant worsening of pain symptoms," which made her physical capacities "extremely limited." A.R. 281, 419, 492, 494. The ALJ, however, never mentioned any of these other assessments of Arakas's fibromyalgia and its severity. His failure to conduct a holistic review of Arakas's longitudinal record indicates that he did not properly consider the waxing and waning nature of fibromyalgia.

Substantial evidence also does not support the ALJ's conclusion that Arakas's "conservative course of treatment [wa]s inconsistent with a level of severity that would preclude [her] from sustaining any work activity." A.R. 513. Actually, her course of treatment was typical for fibromyalgia. "In general, treatments for fibromyalgia include both medication and self-care strategies. The emphasis is on minimizing symptoms and improving general health." Mayo Clinic, *Fibromyalgia Diagnosis & Treatment* (Oct. 7, 2020), https://www.mayoclinic.org/diseases-conditions/fibromyalgia/diagnosis-treatment/drc-20354785. Appropriate medications for fibromyalgia include pain relievers, antidepressants, and anti-seizure drugs. *Id.* Notably, narcotic painkillers "are not recommended, because they can lead to significant side effects and dependence and will worsen the pain over time." *Id.*

Here, the ALJ discredited Arakas's subjective complaints based partly on her "conservative course of treatment" and the fact that she no longer took narcotic painkillers after 2011, but only antidepressants and nonsteroidal anti-inflammatory pain relievers. But her doctors' treatment decisions were wholly consistent with how fibromyalgia is treated generally. Arakas cannot be faulted "for failing to pursue non-conservative treatment options where none exist." *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010).

Moreover, SSR 16-3p states that "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, [or] referrals to specialists, . . . may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." 2016 WL 1119029, at *8. Arakas has made each of those very attempts over the years. Thus, the ALJ's finding of

29

inconsistency between Arakas's subjective complaints and her treatment record was erroneous.

In sum, the ALJ made several errors in his assessment of Arakas's subjective complaints regarding her symptoms. He applied the wrong legal standard by effectively requiring Arakas to provide objective medical evidence of her symptoms. He improperly cherry-picked, misstated, and mischaracterized facts from the record. He drew various conclusions unsupported by substantial evidence and failed to explain them adequately. Finally, his decision exhibits a pervasive misunderstanding of fibromyalgia. Thus, we reverse the ALJ's determination that Arakas was not disabled during the relevant period.[7]

IV.

Arakas also argues on appeal that substantial evidence does not support the ALJ's reasons for according "little weight" to Dr. Harper's opinion. As the Commissioner correctly points out, however, Arakas has waived appellate review of this issue by failing to raise it as a specific objection to the magistrate judge's Report and Recommendation. Despite the waiver, we deem it proper to exercise our discretion to review the issue in the interest of justice, and we conclude that the ALJ erred by according little weight to Dr. Harper's opinion.

A.

Under 28 U.S.C. § 636(b)(1), "any party may serve and file written objections" to a magistrate judge's Report and Recommendation within 14 days of being served with a

---

[7] We explain our reasons for reversing, rather than vacating and remanding, the ALJ decision in Part V of this opinion.

copy of the report. A failure to make a timely objection to a Report and Recommendation constitutes a waiver of appellate review. *United States v. Schronce*, 727 F.2d 91, 93–94 (4th Cir. 1984). "[A] party also waives a right to appellate review of particular issues by failing to file timely objections specifically directed to those issues." *United States v. Midgette*, 478 F.3d 616, 621 (4th Cir. 2007). "[T]o preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." *Id.* at 622.

Arakas has waived appellate review of her argument by failing to assert it as a specific objection to the Report and Recommendation. In her brief to the magistrate judge, Arakas made four distinct arguments, one of which was that substantial evidence did not support the ALJ's reasons for according little weight to Dr. Harper's opinion. Accordingly, the magistrate judge addressed this argument directly and concluded that the ALJ did not err in assigning little weight to Dr. Harper's opinion. *See* J.A. 44–47.[8] But Arakas did not raise this issue at all in her objections to the Report and Recommendation; in fact, she never even mentioned the ALJ's weighing of Dr. Harper's opinion. Hence, the district court did not address it either. Because Arakas failed to make an objection with sufficient specificity, she has waived appellate review of this issue.[9]

---

[8] Citations to "J.A. ___" refer to the Joint Appendix filed by the parties in this appeal.

[9] Arakas suggests that her objection regarding Dr. Harper's opinion was implied in her objection concerning the ALJ's evaluation of her fibromyalgia symptoms. This argument lacks merit. Our precedent requires parties to raise any objection to a Report and

B.

The fact that Arakas has waived review of this issue does not end our analysis. She alternatively asks us to exercise our discretion to address the issue in the interest of justice.

The Supreme Court has held that "because the rule [that a failure to file timely objections to the magistrate judge's report constitutes a waiver of appellate review] is a nonjurisdictional waiver provision, the Court of Appeals may excuse the default in the interests of justice." *Thomas v. Arn*, 474 U.S. 140, 155 (1985). But, while this Court has recognized that the failure-to-object waiver rule "is not absolute," *Wright v. Collins*, 766 F.2d 841, 845 (4th Cir. 1985), our precedents provide only limited guidance on the scope of any discretionary exception to the rule.

To date, we have exercised discretionary review only in the context of "procedural ambush"—*i.e.*, where a *pro se* litigant receives inadequate notice of the possible consequences of the failure to file timely objections to the magistrate judge's Report and Recommendation.[10] *See, e.g.*, *id.* at 845–47; *see also Wells v. Shriners Hosp.*, 109 F.3d 198, 200 (4th Cir. 1997) (refusing to extend *Wright* to represented parties).[11] We conclude

---

Recommendation explicitly and with sufficient specificity to preserve the right to appeal. *See Midgette*, 478 F.3d at 622.

[10] This exception is inapplicable here, as it is undisputed that Arakas was represented by counsel throughout the district court proceedings and that she received adequate notice regarding the consequences of failing to timely file specific written objections to the magistrate judge's Report and Recommendation.

[11] Relatedly, we have also held that a *pro se* inmate's attachment of an "Amended Complaint," which restated most of his claims, to his objection to the magistrate judge's Report and Recommendation "sufficiently alerted the district court that he believed the magistrate judge erred in recommending dismissal of those claims." *Martin v. Duffy*, 858

today that in some cases, such as this one, we may also "excuse the default in the interests of justice." *Thomas*, 474 U.S. at 155.

Our conclusion accords with the positions taken by our sister circuits on this issue since *Thomas*. Several circuits do not impose a strict waiver of appellate review, as we do, on a party who fails to timely object to a magistrate judge's report. *See, e.g.*, *Nara v. Frank*, 488 F.3d 187, 194 (3d Cir.), *as amended* (June 12, 2007); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428 (5th Cir. 1996) (en banc); *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013). And even those circuits with a strict waiver rule akin to ours have generally recognized an "interest of justice" exception based on the Supreme Court's pronouncement in *Thomas*. *See, e.g.*, *Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 174 (2d Cir. 2000); *Souter v. Jones*, 395 F.3d 577, 585 (6th Cir. 2005); *United States v. Charles*, 476 F.3d 492, 496 (7th Cir. 2007); *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008).[12] Accordingly, we too acknowledge our discretion to excuse a failure-to-object waiver of appellate review in the interest of justice.

---

F.3d 239, 246 (4th Cir. 2017). This holding was based on our duty to construe *pro se* filings liberally. *Martin* could be understood as an "interest of justice" exception to (or at least a flexible application of) the waiver rule set forth in *Midgette*, where we held that a party "waives a right to appellate review of particular issues by failing to file timely objections specifically directed to those issues." *Midgette*, 478 F.3d at 621.

[12] Although the First Circuit has not explicitly recognized an "interest of justice" exception, its opinion in *Santiago v. Canon U.S.A., Inc.* seems to imply that a waived issue could be reviewed for plain error—an exception presumably intended to serve the interest of justice. *See Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 4 n.4 (1st Cir. 1998).

To determine whether such an exception should apply in this case, we must first consider what factors may be relevant to making that determination. Our cases dealing with discretionary review of issues raised for the first time on appeal provide useful guidance. After all, in our circuit, a litigant who raises an issue before the magistrate judge but fails to make a timely objection directed to that issue before the district judge is in a position similar to that of a litigant who fails to raise the issue at all prior to appeal. *Compare Midgette*, 478 F.3d at 621 (holding that a party "waives a right to appellate review of particular issues by failing to file timely objections specifically directed to those issues"), *with Holland v. Big River Minerals Corp.*, 181 F.3d 597, 605 (4th Cir. 1999) ("Generally, issues that were not raised in the district court will not be addressed on appeal.").

"The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). Generally, parties waive appellate review of any issue not raised below. *Id.* at 120. However, Supreme Court and Fourth Circuit case law has recognized a few discretionary exceptions to this rule. In *Singleton*, the Supreme Court described two circumstances where an appellate court may resolve an issue not passed on below: (1) "where the proper resolution is beyond any doubt"; or (2) "where injustice might otherwise result." *Id.* at 121 (internal quotation marks and citations omitted). In *Liberty University, Inc. v. Lew*, we noted two additional such circumstances: (3) "when refusal to [review] would constitute plain error"; or (4) "where there is an intervening change in the case law." 733 F.3d 72, 104 (4th Cir. 2013).

In deciding whether to exercise our discretion in this regard, we have considered factors such as (1) whether both parties had ample opportunity to develop facts pertaining to the issue; (2) whether the issue is primarily a question of law[13]; (3) whether the issue was briefed and argued on appeal; (4) whether the proper outcome is beyond doubt, rendering a remand pointless[14]; and (5) whether a discretionary remand to the district court for consideration of the waived issue in the first instance would produce injustice for a party. *See, e.g.*, *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 142–43 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 605 (2018); *Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 165–66 n.4 (4th Cir. 1997) (en banc), *overruled on other grounds by Bragdon v. Abbott*, 524 U.S. 624 (1998); *Nealon v. Stone*, 958 F.2d 584, 591 n.6 (4th Cir. 1992); *Childers v. Chesapeake & Potomac Tel. Co.*, 881 F.2d 1259, 1263–64 n.1 (4th Cir. 1989).

Here, each of these factors weighs in favor of discretionary review.[15] First, no prejudice or procedural unfairness would result from reviewing whether substantial evidence supports the ALJ's decision to accord little weight to Dr. Harper's opinion, as the Commissioner has had ample opportunity to address it (and has addressed it) before both the district court and this Court. Second, the issue is a legal one whose resolution does not

---

[13] This factor's relevance to the failure-to-object context is bolstered by some of our sister circuits' approach of applying the waiver rule to only factual findings, but not legal conclusions. *See, e.g.*, *Nash*, 781 F.2d at 667 (8th Cir.); *Miranda*, 684 F.3d at 848 (9th Cir.); *Dupree*, 715 F.3d at 1300 (11th Cir.).

[14] At least some of the other circuits that apply a strict failure-to-object waiver rule consider "whether the defaulted argument has substantial merit" as a factor in deciding whether to exercise discretionary review in the interest of justice. *Spence*, 219 F.3d at 174 (2d. Cir.); *see also Theede v. U.S. Dep't of Labor*, 172 F.3d 1262, 1268 (10th Cir. 1999).

[15] Arakas raises similar arguments for discretionary review in her reply brief.

require additional factfinding. Third, the issue was adequately briefed by both parties. Fourth, as we explain below, the proper disposition of the issue is beyond doubt, as the ALJ's decision to accord little weight to Dr. Harper's opinion was unquestionably erroneous. Finally, a remand would produce significant injustice for Arakas. She has been fighting to obtain disability benefits for over ten years, and another remand at this stage would only delay justice further, should Arakas ultimately be found eligible for benefits— which, as we hold below, is the proper outcome.

Accordingly, we conclude that discretionary review of the waived issue is warranted here. As the Supreme Court has rightly noted, "[r]ules of practice and procedure are devised to promote the ends of justice, not to defeat them." *Hormel v. Helvering*, 312 U.S. 552, 557 (1941).

C.

Having determined that we will exercise our discretion to review whether the ALJ properly gave little weight to Dr. Harper's opinion, we now turn to that issue. We conclude that the ALJ's treatment of Dr. Harper's opinion contains several errors and is not supported by substantial evidence. Perhaps most importantly, the ALJ legally erred by failing to adhere to the "treating physician rule" clearly established by both SSA policy and Fourth Circuit precedent.

1.

The ALJ's conclusion that "[t]he lack of substantial support from the other objective evidence of record render[ed] [Dr. Harper's] opinion less persuasive," A.R. 514, was erroneous for multiple reasons. To start, it is vague and conclusory, as the ALJ "did not

36

specify what 'objective evidence' . . . he was referring to." *Monroe*, 826 F.3d at 191. The ALJ's cursory explanation fell far short of his obligation to provide "a narrative discussion [of] how the evidence support[ed] [his] conclusion," and "[a]s such, the analysis is incomplete and precludes meaningful review." *Id.* at 190–91 (quoting *Mascio*, 780 F.3d at 636). Moreover, as discussed above, a lack of support from objective medical evidence means very little in fibromyalgia cases. The ALJ's insistence on objective medical evidence, again, reveals his misunderstanding of fibromyalgia, which does not produce such evidence other than trigger points. And here, the record contained ample evidence of consistent trigger-point findings.

2.

More importantly, the ALJ disregarded agency policy and this Court's precedent by applying an incorrect legal standard in evaluating the weight to be accorded to Dr. Harper's opinion. In Social Security disability cases, the "treating physician rule" is well-established. SSA instructs claimants that "[g]enerally," SSA will "give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

Accordingly, the treating physician rule requires that ALJs give "controlling weight" to a treating physician's opinion on the nature and severity of the claimant's impairment if that opinion is (1) "well-supported by medically acceptable clinical and

laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence" in the record. *Id.* Upon deciding not to give *controlling* weight to a treating physician's opinion, ALJs must determine the appropriate weight to be accorded to the opinion by considering "all of . . . the factors" listed in the regulation, which include the length of the treatment relationship, consistency of the opinion with the record, and the physician's specialization. *Id.* § 404.1527(c)(2)–(6). SSR 96-2p further notes that "[i]n many cases, a treating [physician's] medical opinion will be entitled to the *greatest* weight and should be adopted, even if it does not meet the test for *controlling* weight." 1996 WL 374188, at \*4 (July 2, 1996) (emphases added).

We have emphasized that the treating physician rule is a robust one: "[T]he opinion of a claimant's treating physician [must] be given great weight and may be disregarded only if there is persuasive contradictory evidence." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In *Coffman*, the ALJ discredited a treating physician's opinion regarding the claimant's ability to work by stating that "[t]he weight to be given such [a] conclusionary statement depends on the extent to which it is supported by specific and completed clinical findings and other evidence. I find that this conclusionary statement does not have the required support in the record." *Id.* at 517–18. We held that the ALJ misstated the legal standard because a "treating physician's testimony is ignored *only if* there is persuasive contradictory evidence." *Id.* at 518 (quoting *Foster v. Heckler*, 780 F.2d 1125, 1130 (4th Cir. 1986)).

Here, the ALJ made the same legal error. While he reasoned that the "lack of substantial support from the other objective evidence of record" rendered Dr. Harper's

opinion "less persuasive," A.R. 514, the law makes it clear that such support is not necessary for according controlling or great weight to a treating physician's opinion. Rather, the opinion *must* be given controlling weight *unless* it is based on medically unacceptable clinical or laboratory diagnostic techniques or is *contradicted* by the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Coffman*, 829 F.2d at 517. Therefore, the ALJ applied an incorrect legal standard, contravening both agency policy and Fourth Circuit law. *See Hines*, 453 F.3d at 561 (holding that ALJ applied an "improper standard to disregard the treating physician's opinion that [claimant] was fully disabled").

Under the correct legal standard, Dr. Harper's opinion regarding the severity, persistence, and limiting effects of Arakas's impairments was entitled to controlling weight. He diagnosed Arakas's fibromyalgia based on consistent findings of diffuse trigger points, in accordance with the diagnostic criteria of the American College of Rheumatology. Thus, his opinion was well-supported by "the clinical and laboratory diagnostic techniques . . . generally accepted within the medical community as the appropriate techniques to establish the existence and severity of" fibromyalgia. SSR 96-2p, 1996 WL 374188, at *3; *see also* SSR 12-2p, 2012 WL 3104869, at *2 (stating that SSA will deem a claimant's fibromyalgia to be a medically determinable impairment if it was diagnosed under either the 1990 or 2010 American College of Rheumatology criteria). Moreover, Dr. Harper's opinion was not contradicted by other substantial evidence in the record. Rather, as described below, it was consistent with his twenty years' worth of treatment notes, other physicians' medical findings, and Arakas's testimony.

39

Additionally, after (erroneously) determining that controlling weight was not appropriate for Dr. Harper's opinion, the ALJ failed to apply the factors listed in 20 C.F.R. § 404.1527(c) to decide how much weight it *should* be accorded.[16] He also disregarded SSR 96-2p's mandate that generally, a treating physician's opinion, even if not controlling, should be entitled to the greatest weight and adopted. *See* 1996 WL 374188, at *4. Thus, substantial evidence does not support the ALJ's decision to accord little weight to Dr. Harper's opinion.

Persuasive authority further bolsters the conclusion that Dr. Harper's opinion was entitled to controlling weight. In a case involving a claimant with fibromyalgia, the Second Circuit held that her treating rheumatologist's opinion regarding her impairments "should have been accorded controlling weight." *Green-Younger*, 335 F.3d at 106. The court cited several factors that led to this conclusion. First, at the time of the ALJ hearing, the physician had coordinated the claimant's care for over three years, "during which time she underwent numerous physical examinations and diagnostic procedures." *Id.* at 107. Second, her fibromyalgia diagnosis was well-supported by medically acceptable diagnostic techniques under the American College of Rheumatology guidelines—*i.e.*, chronic widespread pain and multiple tender points. *Id.* Third, "MRIs showed some bulging in [the claimant's] discs

---

[16] The ALJ seemingly did consider the consistency of Dr. Harper's medical opinion with the record as a whole, which is one of the factors listed in the regulation. However, 20 C.F.R. § 404.1527(c) requires ALJs to consider *all* of the enumerated factors in deciding what weight to give to a medical opinion. 20 C.F.R. § 404.1527(c). Here, the ALJ failed to address the other factors. Those factors include the nature and length of the treatment relationship and Dr. Harper's specialization as a rheumatologist, both of which support giving greater weight to Dr. Harper's opinion regarding Arakas's fibromyalgia.

and several doctors concurred that [she] had a history of degenerative disc disease." *Id.* Fourth, the rheumatologist ordered various treatments, including medications, epidural blocks, steroid injections, and physical therapy, but found that "they failed to provide any significant improvement" in the claimant's condition. *Id.*

Importantly, *every single one* of these factors is also present in Arakas's case. If anything, there is more reason to accord controlling weight to the treating physician's opinion in this case than there was in *Green-Younger*, as Dr. Harper had coordinated Arakas's care for over *twenty years* by the time of the 2017 ALJ hearing. Thus, we conclude that the ALJ erred in denying controlling weight to Dr. Harper's opinion. "For this reason, if for no other, the denial of benefits must be reversed." *Coffman*, 829 F.2d at 518.

3.

The treating physician rule instructs that Dr. Harper's opinion should have been given controlling weight. But additionally, substantial evidence does not support the ALJ's decision to accord little weight to Dr. Harper's opinion.

First, the ALJ accorded little weight to Dr. Harper's opinion in part because it was "based primarily on the claimant's subjective symptoms," which the ALJ deemed unreliable. A.R. 514. As explained above, however, the ALJ's reasons for discrediting Arakas's subjective complaints were erroneous. And Dr. Harper's reliance on Arakas's subjective complaints "hardly undermines his opinion as to her functional limitations, as '[a] patient's report of complaints, or history, is an essential diagnostic tool'" in fibromyalgia cases. *Green-Younger*, 335 F.3d at 107 (alteration in original) (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)).

41

Second, the ALJ improperly substituted his own opinion for Dr. Harper's. An ALJ may not substitute his own lay opinion for a medical expert's when evaluating the significance of clinical findings. *See Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984). Of particular relevance here, ALJs may not draw their own conclusions from medical imaging, as they lack the expertise to interpret it. *See Hoyt v. Colvin*, 553 F. App'x 625, 627 (7th Cir. 2014) (holding that ALJ erred "by interpreting [claimant's] electromyography exam and lumbar MRI as inconsistent with his complaints of pain"); *Kelly v. Berryhill*, 732 F. App'x 558, 561 (9th Cir. 2018) (noting that ALJ erred by asserting that "objective medical imaging did not indicate disabling impairment").

Yet that is precisely what the ALJ did in Arakas's case. He wrote that, "[w]hile Dr. Harper reported that a cervical MRI showed clear evidence of chronic cervical spasm and degenerative disc disease, I note that an MRI would not document a chronic condition of spasm." A.R. 514.[17] Because the ALJ lacked the medical expertise to interpret a cervical MRI, he erred in discounting Dr. Harper's opinion based on his own lay views of what an MRI could demonstrate.

The Commissioner seeks to frame the ALJ's statement as an attempt to resolve the alleged inconsistency between Dr. Harper's assertion that the MRI showed evidence of chronic muscle spasm and the fact that the radiologist who read the MRI did not note such evidence. We reject this argument as a meritless post-hoc justification. *See Radford v.*

---

[17] Dr. Jervey—the neurologist who ordered the cervical MRI for Arakas and did an initial read of the films—also found "evidence of cervical dystonia [spasm]." A.R. 476. The ALJ did not account for this evidence.

*Colvin*, 734 F.3d 288, 294 (4th Cir. 2013) (rejecting the Commissioner's attempt to justify the ALJ's denial of disability benefits as a post-hoc rationalization); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action.") (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (applying *Burlington Truck* in a Social Security disability case).

Here, the ALJ decision never even mentioned the radiologist, and his statement that "an MRI *would not* document" chronic cervical spasm is a blanket claim based on his own lay assumption, contradicted by Dr. Harper's medical opinions, and unsupported by anything in the record. A.R. 514 (emphasis added).

Third, the ALJ erred in concluding that Dr. Harper's opinions were "more vocational" than "medical," and thus "not worthy of great weight." A.R. 514. Although the ALJ failed to specify which opinions he deemed vocational, he was likely referring to Dr. Harper's opinion that Arakas had been "unable to sustain full-time work activity of 8 hours per day, 5 days a week"—"even at a light exertional level"—since January 1, 2010. A.R. 502–03.

However, we have previously held that ALJs may not disregard such opinions when offered by a treating physician. *See, e.g.*, *Hines*, 453 F.3d at 563 (holding that the "ALJ improperly refused to credit [the treating physician's] medical opinion that his long term patient . . . was totally disabled"). Our sister circuits agree. *See Hill v. Astrue*, 698 F.3d 1153, 1160 (9th Cir. 2012) (finding that the ALJ erred by disregarding the treating physician's opinion that the claimant's "combination of mental and medical problems

43

makes . . . sustained full time competitive employment unlikely"); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (concluding that the ALJ's rejection of the treating physician's "four-hour [work] day restriction" was "wrong" because "medical opinions on how much work a claimant can do are not only allowed, but encouraged"). Moreover, Dr. Harper substantiated his opinion with medical findings and objective evidence such as the cervical MRI results.

Fourth, the ALJ's decision to accord little weight to Dr. Harper's opinion relied on material misstatements of fact. For example, the ALJ gave "little weight to Dr. Harper's assessment that [Arakas's] fibromyalgia [wa]s associated with chronic cognitive dysfunction," because Dr. Harper's "own treatment notes [did] not document any complaints of 'brain fog,' decreased concentration, or similar symptoms." A.R. 514. Contrary to the ALJ's assertion, however, Dr. Harper recorded that Arakas was "unable to concentrate" and had "[d]ifficulty concentrating" in his treatment notes from April 26, 2012 and March 29, 2016, respectively. A.R. 490, 759. Similarly, the ALJ stated that Dr. Harper did not record any complaints of sedation or daytime somnolence. This was error. *See* A.R. 759 (Dr. Harper's March 29, 2016 notes documenting "[s]omnolence").[18]

Fifth, the ALJ erred in finding that Arakas's part-time work in 2017 contradicted Dr. Harper's conclusion regarding her inability to perform any work activity on a sustained

---

[18] The Commissioner's brief too contains misstatements of fact. For example, it states that Arakas was "never prescribed" hydrocodone. Appellee's Br. at 31. But the record shows that she was in fact sometimes prescribed painkillers containing hydrocodone (Lorcet or Lortab) to control severe pain. *See* Drug Enf't Admin., *Hydrocodone* (Oct. 2019), https://www.deadiversion.usdoj.gov/drug_chem_info/hydrocodone.pdf (listing Lortab and Lorcet as trade names for pain medications containing hydrocodone and acetaminophen).

basis. No inconsistency exists here. Again, being able to help out at her sister-in-law's restaurant for about 4 hours per week (and with significant difficulty) in no way suggests that Arakas could sustain full-time work of 40 hours a week. *See Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) ("There is a significant difference between being able to work a few hours a week and having the capacity to work full time.").

Finally, the ALJ's decision to accord "significant weight" to the opinions of the non-treating, non-examining state agency consultants was erroneous. ALJs must provide a narrative discussion of how specific evidence supports the "varying degrees of weight" assigned to different opinions. *Monroe*, 826 F.3d at 190. The ALJ's mere conclusory explanation that the medical consultants' opinions were "generally consistent with the other evidence of record" fell far short of this requirement. A.R. 515.

Moreover, under the factors listed in 20 C.F.R. § 404.1527(c), the ALJ's decision to assign greater weight to the non-examining, non-treating consultants' opinions than to Dr. Harper's makes little sense. Under the regulation, greater weight is generally accorded to the medical opinion of a source who has examined the claimant; a source who has treated the claimant; and a specialist in the relevant area of medicine. 20 C.F.R. § 404.1527(c)(1), (2), (5). Under each of these factors, the ALJ should have given more weight to Dr. Harper's opinions than to those of the state agency consultants.[19] His failure to do so was

---

[19] "Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist." *Sarchet*, 78 F.3d at 307. Whereas Dr. Harper is a board-certified rheumatologist, the two state agency consultants' specialties are surgery and gynecology, respectively. *See* A.R. 416, 455; Soc. Sec. Admin., Policy Operations Manual System, DI 24501.004 (May 5, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

particularly improper because, given the unique nature of fibromyalgia, its symptoms cannot be properly assessed and verified by a non-treating or non-examining source. *See Rogers*, 486 F.3d at 245. Therefore, the ALJ erred by according significant weight to the state agency consultants' opinions.

V.

For the foregoing reasons, we hold that the ALJ erred in discrediting Arakas's subjective complaints regarding her symptoms and in according little weight to Dr. Harper's opinion. The ALJ's denial of disability benefits was based on erroneous legal standards and not supported by substantial evidence. We simply cannot uphold a decision plagued by so many errors.

This Court has the authority to affirm, modify, or reverse the Commissioner's final decision "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Federal courts, including this Court, have awarded disability benefits without remand where the record clearly establishes the claimant's entitlement to benefits and another ALJ hearing on remand would serve no useful purpose. *See, e.g.*, *Hines*, 453 F.3d at 567; *Crider v. Harris*, 624 F.2d 15, 17 (4th Cir. 1980); *Revels*, 874 F.3d at 668–69; *Green-Younger*, 335 F.3d at 109; *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 865 (6th Cir. 2011). For example, in *Hines*, we awarded benefits to the claimant after finding, based on the "undisputed evidence in the record," that he did "not have the capacity to function at any [Residual Functional Capacity] level that require[d] an eight hour work day or its equivalent on a continual basis." 453 F.3d at 566–67.

Here too, the undisputed evidence in the record compels us to conclude that Arakas was unable to sustain full-time work—eight hours a day, five days a week[20]—during the relevant period.[21] For many years, Arakas has suffered chronic, debilitating pain and fatigue caused by a combination of comorbid conditions including fibromyalgia, degenerative disc disease, and carpal tunnel syndrome. According to her testimony, her symptoms were severe enough that she had trouble cooking, drying her hair, buttoning her blouse, picking up a coin, performing household chores, walking even short distances, or sitting for 45 minutes. And she could barely do anything after noon on most days due to her symptoms. She experienced flare-ups on and off for at least half a month at a time, during which the pain was bad enough to miss work. She had difficulty working for even four hours a week. Arakas's extensive medical records corroborate the severity,

---

[20] Ordinarily, Residual Functional Capacity is an "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," which means "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8P, 1996 WL 374184, at *2. Although the ability to work eight hours a day for five days a week is not required if the claimant's past relevant work was part-time employment that amounted to "substantial gainful activity," *id.* at *2 n.2, that is not the case here. Arakas's past relevant work was her *full-time* employment as a dining room manager. *See* A.R. 515.

[21] In a case involving a claimant with fibromyalgia, arthritis, and carpal tunnel syndrome, the Sixth Circuit reversed the Commissioner's decision and granted benefits without remanding because, "[i]n view of the plaintiff's treating physician['s] opinions and the plaintiff's own assertions of disabling pain, stiffness, fatigue, and inability to concentrate, there exists strong evidence that the plaintiff's combined impairments meet or exceed a listed impairment under the Social Security regulations"—which mandated a finding of disability without even a need for a Residual Functional Capacity assessment. *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 865 (6th Cir. 2011). We do not address whether we would reach a similar result here since Arakas has made no argument to that effect.

persistence, and limiting effects of her impairments. And based on his twenty years of examining and treating Arakas, Dr. Harper concluded that she was incapable of performing full-time work on a sustained basis—an opinion that must be accorded controlling weight.

In sum, once Arakas's testimony and Dr. Harper's opinion regarding her impairments are properly credited, it becomes evident that Arakas could not sustain any type of full-time work, including her past work as a dining room manager. Notably, during the 2017 hearing, the vocational expert stated that an individual of Arakas's age, education, work experience, and Residual Functional Capacity could not work as a dining room manager unless she could sustain full-time hours.[22]

Accordingly, we hold that the record as a whole clearly establishes Arakas's disability and thus her legal entitlement to disability benefits. *See Revels*, 874 F.3d at 669 (awarding benefits to claimant suffering from fibromyalgia because, based "on the record as a whole," there was no "serious doubt" that she was disabled); *Green-Younger*, 335 F.3d at 109 (awarding benefits to claimant with fibromyalgia because her inability to perform past relevant work became clear when her treating rheumatologist's opinion was given controlling weight).

Given our finding of Arakas's disability, remanding the case for yet another ALJ hearing would be not only pointless, but also unjust. Despite having a meritorious claim,

---

[22] Moreover, at the first ALJ hearing, a different vocational expert testified that such an individual could not perform *any jobs* in the national economy *even at the sedentary level*—which is less exertional than light work—if she had to take unscheduled breaks throughout the workday and/or miss work more than two days per month due to her symptoms. The record demonstrates that Arakas, *at minimum*, would need such breaks.

48

Arakas has been denied disability benefits and forced to undergo costly litigation for ten years, solely because of the agency's errors. After multiple denials and reconsideration requests, two ALJ hearings, and two federal suits, we simply cannot delay justice any longer. Therefore, we reverse and remand the case to the Commissioner for a calculation of disability benefits.

VI.

Based on a full review of the record, we hold that the ALJ erred in discrediting Arakas's subjective complaints and in according little weight to her treating physician's opinion. The ALJ's non-disability finding was based on incorrect legal standards and not supported by substantial evidence. Because we conclude, based on the undisputed evidence in the record, that Arakas was legally disabled during the relevant period, we reverse the Commissioner's decision and remand the case for a calculation of disability benefits.

*REVERSED AND REMANDED*
*WITH INSTRUCTIONS*