**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-2277**

ANTONIO BILOTTA,

                Plaintiff − Appellant,

      v.

ANDREW SAUL, Commissioner of Social Security,

                Defendant – Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Statesville.  Frank D. Whitney, District Judge.  (5:18-cv-00121-FDW-DSC)

Argued:  December 9, 2020                        Decided:  March 10, 2021

Before WILKINSON, NIEMEYER, and DIAZ, Circuit Judges.

Reversed and remanded with instructions by unpublished opinion.  Judge Diaz wrote the opinion, in which Judge Wilkinson and Judge Niemeyer joined.

**ARGUED:**  George C. Piemonte, MARTIN JONES & PIEMONTE, PC, Charlotte, North Carolina, for Appellant.  David Nathaniel Mervis, SOCIAL SECURITY ADMINISTRATION, Baltimore, Maryland, for Appellee.  **ON BRIEF:**  R. Andrew Murray, United States Attorney, Charlotte, North Carolina, Gill P. Beck, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Antonio Bilotta appeals the Social Security Administration's denial of his application for disability insurance benefits, contending that the administrative law judge ("ALJ") erred in finding that he had a marginal education and that he was capable of medium work. We conclude that the record clearly establishes that Bilotta was disabled during the relevant period. Accordingly, we reverse and remand the matter to the district court with instructions to remand to the Commissioner for a calculation of benefits.

## I.

### A.

Bilotta was born in Italy. He attended school irregularly and quit in the third grade to work on a farm with his parents, who were sharecroppers. In 1979, Bilotta moved to Boston. There, he learned to lay tile from someone who spoke Italian to him. Bilotta worked as a tile setter in the United States for more than twenty years, but he never learned to read or write English beyond identifying most letters and printing his name. To this day, he speaks English with a strong accent.

In 2007, Bilotta experienced severe pain in his right knee, which grew progressively worse and was aggravated by walking. Later that year, surgeons performed an arthroscopic partial lateral meniscectomy[1] and an open resection of a Baker's cyst[2] on his right knee.

Bilotta felt fine for almost two years before his knee began hurting again. He started taking over-the-counter pain medication daily to alleviate the symptoms. Bilotta then applied for disability benefits[3] and the Social Security Administration referred Bilotta for consultative physical and psychological examinations.

The examining physician, Dr. Aregai Girmay, observed that Bilotta had an "abnormal range of motion on the bilateral knee, but the right is worse than the left." A.R. 524. Bilotta reported that he had "chronic pain on both knees," which is "sharp and constant," ranging from a three to a ten on a scale of one to ten, and "gets worse when he is kneeling or bending." A.R. 523. However, Girmay noted that Bilotta's gait was normal and that he could walk 100 feet without difficulty. Girmay concluded that Bilotta has a "mild-to-moderate" limitation and may have osteoarthritis. A.R. 525. An x-ray taken in November 2009 similarly reflected "[m]ild degenerative changes with minimal joint effusion" in Bilotta's right knee. A.R. 527.

---

[1] This procedure removes a damaged portion of the lateral meniscus, which is the cartilage on the outer edge of the knee joint.

[2] A Baker's cyst is a fluid-filled bulge at the back of the knee that usually results from knee-joint conditions, such as arthritis, which cause the joint to overproduce lubricating fluid.

[3] Bilotta abandoned this application before filing his current application for benefits.

3

John Bevis, a Licensed Psychological Associate, and Dr. Michael Fiore assessed Bilotta's mental status and administered achievement testing. Bilotta told them that "he has problems with general weakness with pain and stiffness in his right knee, which prevents him from kneeling down or standing or walking for more than a few minutes at a time," "he cannot go up or down a ladder" or "down stairs normally," and "he is unable to bend down or kneel." A.R. 516. Indeed, Bevis and Fiore observed that Bilotta "ambulated slowly as he is unable to kneel or bend his right knee, which prevents him from performing physical labor that requires bending or lifting." A.R. 517.

The achievement test results showed that Bilotta had a learning disability in math and reading and was probably "functioning within the borderline range of intelligence," which may result in "difficulties relating to fellow workers and supervisors." A.R. 518–19. His performance in reading and writing was at or below the kindergarten level. Bevis and Fiore thus concluded that Bilotta would "require assistance in managing his personal, financial, and business affairs, as [he] is illiterate." A.R. 520.

On February 23, 2010, Bilotta saw Dr. Michael Roberts, an orthopedist, for pain and swelling in his right knee. Roberts observed that Bilotta walked with a "bit of a limp favoring the right knee." A.R. 543. X-rays on Bilotta's knees showed "degenerative arthritic changes, lateral compartment most seriously involved and right is worse than left." *Id.* Roberts assessed Bilotta with right knee arthritis with "significant effusion" and "diffuse tenderness," administered an anti-inflammatory injection, and prescribed a nonsteroidal anti-inflammatory drug. *Id.*

Bilotta met with Roberts and a chiropractor several more times in 2012 and beyond for his knee pain. Bilotta's medical records include his body mass indices ("BMIs") from 2008 to 2015, which ranged from 33 to 36.

B.

To collect disability insurance benefits, the claimant must prove that he was disabled before the date last insured. *See* 42 U.S.C. §§ 416(i), 423. Here, the parties agree that Bilotta's date last insured was December 31, 2010. Bilotta submitted his current application for disability insurance benefits in 2012, alleging that he had been disabled since January 1, 2008. He later amended his date of disability to February 23, 2010.

Bilotta's lawyer completed the benefits application. In response to questions regarding Bilotta's work activities, the lawyer wrote that the answers were estimates based on "a typical person who installs ceramic tile" because Bilotta "has trouble communicating over the phone and in English." A.R. 392. But some of the answers on the application are plainly incorrect. *See, e.g.*, A.R. 390 ("What is your height without shoes? 9' 9." What is your weight without shoes? 999 lbs."). The application also states that Bilotta can't "speak and understand English" but can "read and understand English" and "write more than [his] name in English." A.R. 389.

The Social Security Administration denied Bilotta's application. Bilotta requested reconsideration, and in February 2012, the agency had Bilotta's records independently reviewed by physical and psychological consultants.

The physical consultants opined that Bilotta was able to lift and carry 25 pounds frequently and 50 pounds occasionally, and was able to stand and walk for six hours of an

5

eight-hour day during the relevant period. They thus concluded that Bilotta had the residual functional capacity to perform medium work[4] but that he was limited to occasional climbing and frequent balancing, kneeling, crouching, and crawling.

The psychological consultants agreed with the earlier Bevis-Fiore conclusions that Bilotta had borderline intellectual functioning and a learning disability, resulting in moderate difficulties in social functioning. They also noted that Bilotta apparently "learned very little in school" and concluded that because Bilotta prefers Italian, "achievement testing in English would not be suitable." A.R. 139, 150.

The Social Security Administration again denied Bilotta's application for benefits, and Bilotta requested a hearing before an ALJ. An ALJ must employ the five-step evaluation process set out in 20 C.F.R. § 404.1520 to determine whether the claimant has a disability and is therefore entitled to benefits. The process begins with the sequential consideration of whether the claimant "(1) worked during the alleged period of disability; (2) had a severe impairment; [and] (3) had an impairment that met or equaled the requirements of a listed impairment." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing 20 C.F.R. § 416.920(a)(4)).

---

[4] Medium work involves lifting or carrying 25 pounds frequently and 50 pounds occasionally. *See* 20 C.F.R. § 404.1567(c). "A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday" and "being on one's feet for most of the workday is critical." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). Medium work also "usually requires frequent bending-stooping," for which "[f]lexibility of the knees" is "important." *Id.*

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity, which is 'the most' the claimant 'can still do despite' physical and mental limitations that affect [his] ability to work." *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (quoting 20 C.F.R. § 416.945(a)(1)). In light of that residual functional capacity, the ALJ then determines whether the claimant "(4) can return to [his] past relevant work; and (5) if not, can perform any other work in the national economy" considering the claimant's age, education, and work experience. *Hancock*, 667 F.3d at 472 (citing 20 C.F.R. § 416.920(a)(4)).

An ALJ heard Bilotta's claim and found that the first three steps were inconclusive. He then determined that Bilotta was illiterate and had the residual functional capacity to perform light work,[5] but that Bilotta wasn't disabled because he could have performed other work in the national economy during the relevant period. Bilotta requested review of the decision. The Appeals Council granted review, vacated the ALJ's decision, and remanded for a second hearing to address the following issues: (1) the impact of Bilotta's borderline intellectual functioning on his residual functional capacity; (2) the frequency of Bilotta's need to alternate between sitting and standing; (3) the psychological consultants' opinions on Bilotta's difficulties with social functioning; and (4) the effect of the assessed limitations on the availability of work in the national economy.

---

[5] Like medium work, light work may involve "a good deal of walking or standing," but it may also involve "sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls." SSR 83-10, 1983 WL 31251, at *5.

On remand, the ALJ considered additional evidence but ultimately reached the same conclusions. Bilotta again requested review. The Appeals Council granted review, once again vacated the ALJ's decision, and remanded for a third hearing before a new ALJ. This time, the Appeals Council instructed the ALJ on remand to reassess Bilotta's residual functional capacity because the agency consultants indicated that Bilotta was limited to medium work, but the previous ALJ had found (without sufficient explanation) that Bilotta was limited to light work. The Appeals Council explained that "the claimant's maximum residual functional capacity is a determinative issue" because "Medical-Vocational grid rule 202.09[] directs a finding of disabled if the claimant is illiterate" and can only perform light work. A.R. 201–02.

C.

A new ALJ conducted Bilotta's third hearing. The ALJ found that during the period at issue, Bilotta's only severe impairment was osteoarthritis of the right knee. The ALJ discounted the Bevis-Fiore diagnoses of mental impairments (Bilotta's learning disability and borderline intellectual functioning), because the tests were administered in English rather than Bilotta's native Italian, and because Bilotta had previously performed skilled work as a tile setter. A.R. 16. As a result, the first three steps were inconclusive as to disability. *Id.*

The ALJ next determined that during the period at issue, Bilotta had the functional capacity to perform medium work with certain limitations to accommodate the osteoarthritis in his right knee. Specifically, the work could involve only occasional kneeling, crouching, crawling, or climbing of ladders, ropes, or scaffolds. The ALJ also

8

found that Bilotta has "a marginal education and is able to communicate in English" without providing any further explanation of that finding. A.R. 20. The ALJ then concluded at steps four and five that Bilotta couldn't return to work as a tile setter but could have performed other work during the relevant period and thus wasn't disabled. The Appeals Council denied Bilotta's request for reconsideration, making this the agency's final decision.

Having exhausted his administrative remedies, Bilotta brought suit against the Commissioner of Social Security. The parties filed cross-motions for summary judgment. A magistrate judge determined that the ALJ's conclusions were supported by substantial evidence and that the ALJ properly relied on the vocational expert's testimony. The district court adopted the magistrate judge's memorandum and recommendation, granted summary judgment to the Commissioner, and affirmed the ALJ's decision.

This appeal followed.

## II.

Bilotta argues that the ALJ lacked substantial evidence to find that he had a marginal education and the residual functional capacity to perform medium work.[6] Our review of

---

[6] Bilotta also contends that the ALJ erred by relying on a vocational expert's testimony without reconciling that testimony with the *Dictionary of Occupational Titles*. Because we need not reach this issue to determine that Bilotta is disabled, we decline to address it further.

the record indeed compels the conclusion that Bilotta is illiterate and incapable of medium work. As a result, we hold that he is disabled under the Social Security Act.

A.

We review a grant of summary judgment de novo, applying the same standard of review that the district court used. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Accordingly, we review whether "the ALJ applied the correct legal standards" de novo, and whether "the factual findings are supported by substantial evidence." *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015). "Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion," and "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Pearson*, 810 F.3d at 207.

"[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Yet even under this deferential standard, we do not 'reflexively rubber-stamp an ALJ's findings.'" *Arakas v. Comm'r*, 983 F.3d 83, 95 (4th Cir. 2020) (quoting *Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017)).

B.

We begin with the ALJ's finding that Bilotta has a marginal education. Education level is one of the "vocational factors" considered at step five of the disability evaluation process. *See* 20 C.F.R. § 404.1520(a)(4)(v), (g). In 2010, the regulations defined five

10

education levels: illiteracy, marginal education, limited education, high school education and above, and inability to communicate in English.[7] 20 C.F.R. § 404.1564(b) (1980).

"Illiteracy means the inability to read or write."[8] *Id*. at (b)(1). A claimant is "illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." *Id.* A claimant has a "marginal education" if the person has "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs." *Id.* at (b)(2). Generally, "formal schooling at a 6th grade level or less is a marginal education." *Id.* But because "the numerical grade level that [the claimant] completed in school may not represent [his] actual educational abilities," the agency will only use numerical grade level to determine educational abilities "if there is no other evidence to contradict it." *Id.* at (b).

---

[7] In 2020, the Social Security Administration eliminated the "inability to communicate in English" category because changes in the national economy have increased the number of jobs available to those with limited English proficiency. *See* Removing Inability To Communicate in English as an Education Category, 85 Fed. Reg. 10586-01, 10587–92 (Feb. 25, 2020).

[8] The parties, the ALJ, and the district court all assumed that "illiteracy" means the inability to read and write *in English*. We thus do the same and note that, at least prior to the 2020 amendments, the regulations were widely understood this way. *See* 20 C.F.R. § 416.964(b) (1980) ("Because English is the dominant language of the [United States], it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. . . . [The Social Security Administration] will ask you . . . whether you are able to speak, understand, read and write *in English*." (emphasis added)); *see also, e.g., Chavez v. Dep't of Health and Human Servs.*, 103 F.3d 849, 852 (9th Cir. 1996) ("[F]or the purposes of these regulations, only literacy in English is considered, since literacy in other languages has little effect on the number of jobs in the national economy available to the claimant.").

In her decision, the ALJ determined without discussion that Bilotta has "a marginal education." A.R. 20. This alone is reversible error, because we have no basis on which to evaluate the ALJ's ruling. *See Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling . . . . includ[ing] a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.").

The ALJ's conclusion is especially puzzling because she also noted that "illiteracy is not a medically determinable impairment and is not included in the claimant's residual functional capacity" but that she accounted for Bilotta's illiteracy at step five of the disability evaluation process. A.R. 20. The ALJ thus recognized Bilotta's illiteracy when analyzing his claim, as she did when she questioned Bilotta and the vocational expert at the administrative hearing. *See, e.g.*, A.R. 98 ("Now you don't read very well -- you don't read in English."). But the ALJ didn't reconcile Bilotta's illiteracy with, or otherwise justify, her finding that Bilotta has a marginal education.

The Commissioner and the district court valiantly attempt to fill in the ALJ's reasoning. Principally, they rely on the ALJ's explanation of her rejection of the Bevis-Fiore conclusions on Bilotta's learning disability and borderline intellectual function: first, because the tests were administered in English rather than Bilotta's native Italian, they don't accurately measure Bilotta's abilities; and second, Bilotta previously performed skilled work as a tile setter and "made no allegation whatsoever that he cannot mentally perform his past work," demonstrating that his intellectual function is greater than the test

12

results suggest. A.R. 16. They also note that Bilotta testified at the administrative hearing in English without a translator. Finally, they point to the statements on Bilotta's 2012 application asserting that Bilotta can read and understand English and write more than his name in English.

But even if the ALJ had relied on any of these facts, none of them amount to substantial evidence that Bilotta has a marginal education. Neither Bilotta's ability to cut tile nor his ability to speak English suggest that he can read and write in English. And even if it was reasonable for the ALJ to "discount the results" of the Bevis-Fiore psychological testing based on Bilotta's weakness in English, Resp. Br. at 27, the Commissioner doesn't explain why the same would apply to the Bevis-Fiore opinion on Bilotta's illiteracy. To the contrary, an exam administered in English seems to be an entirely sensible way to assess English literacy.

Moreover, the Commissioner himself admits that the application form is problematic—namely because someone else filled it out and it "unquestionably contains errors." Resp. Br. at 27 (citing A.R. 398). No reasonable adjudicator would take this mistake-laden form alone as adequate to support the conclusion that Bilotta is literate.

In fact, the record is replete with evidence indicating that Bilotta is illiterate. Bilotta had no formal schooling in the United States and can't read or write in English. His wife confirmed that Bilotta is illiterate and stated that she reads his mail to him and handles his bills. The only experts to opine on the matter, Bevis and Fiore, also concluded that Bilotta is illiterate and that he struggles to read and write in English at the level of a kindergartner. *Cf. Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 450 (6th Cir. 1990) (holding

13

that a claimant whose test results show that he reads and writes at or below the third-grade level is illiterate); *Eggleston v. Bowen*, 851 F.2d 1244, 1248 (10th Cir. 1988) (same for a claimant with test results "at the first grade level or below in reading, spelling and math"). And to the extent that the ALJ considered Bilotta's limited schooling in Italy, the copious contradictory evidence precludes reliance on his numerical grade level to determine his educational category.

On this record, there's no serious doubt that Bilotta is illiterate.

## C.

Next, we address the ALJ's finding that Bilotta could perform medium work with the limitation that he can only "occasionally climb ladders, ropes or scaffolds, kneel, crouch or crawl." A.R. 17. The ALJ offered the following explanation in support of this finding:

> [Medium work] capacity is supported by the objective medical evidence of record that shows prior to Bilotta's date last insured he did not have a severe impairment that interfered with his ability to perform work activity. . . . X-rays of the claimant's knees in February 2012, showed some degenerative changes, right worse than the left; however, there was [sic] no treatment records prior to the date last insured that showed the claimant experienced significant limitations due to his knee impairment. The claimant's gait was normal, he had normal range of motion of his knee, and he did not require an assistive device for ambulation. There was nothing at all to support the need for a sit/stand option.

A.R. 19. But rather than provide substantial evidence of Bilotta's capacity for medium work, this paragraph only exposes the ALJ's inaccurate and incomplete understanding of the evidence.

14

For starters, the x-ray showing degeneration in Bilotta's right knee was taken in February 2010, not (as the ALJ writes) in 2012. And this is no mere scrivener's error, as the Commissioner claims. Not only is the ALJ's misunderstanding of the date consistent with her comment about the lack of treatment records before the date last insured, but the ALJ also misstated the date of this same x-ray a second time in her decision. *See* A.R. 18 ("X-rays of the claimant's knees in February 2012 showed some degenerative arthritic changes of the lateral compartment worse on the right than the left.").

Nor does the ALJ recite any other evidence related to Bilotta's appointment with Dr. Roberts in February 2010, aside from the bare fact that it took place—even though it was the only medical treatment Bilotta received during the relevant period. Throughout her decision, the ALJ describes Roberts's 2012 treatment notes, stating that Bilotta presented with a normal gait, "mild effusion of the knee," and "no palpable tenderness." *See* A.R. 18–19. But the ALJ omits any mention of Roberts's 2010 treatment notes, in which he described more serious symptoms; i.e., that Bilotta had "a bit of a limp favoring the right knee," "significant effusion of the right knee," and "diffuse tenderness." A.R. 543. Alongside the x-ray, these notes constitute "treatment records prior to the date last insured," belying the ALJ's assertions that Bilotta lacked such evidence, that he walked with a normal gait, and that no evidence supported his need for a sit/stand option. A.R. 19.

In addition, the ALJ didn't address Bilotta's obesity. Bilotta's medical records include his BMI over several years, which consistently showed that he was obese. *See* SSR 02-1P, 2002 WL 34686281, at *2 (Sept. 12, 2002) (describing obesity as a BMI of 30 or above). As the Commissioner argues, Bilotta's obesity "*may or may not*" have exacerbated

15

Bilotta's symptoms. Response Br. at 23; *see also* SSR 02-1P, 2002 WL 34686281, at \*6 ("The combined effects of obesity with other impairments may be greater than might be expected without obesity."). But the ALJ's failure to address it at all is reversible error. *Id.* at \*1 ("[The Social Security Administration] consider[s] obesity to be a medically determinable impairment and remind[s] adjudicators to consider its effects when evaluating disability.").

In sum, the ALJ effectively "cherrypick[ed] facts that support a finding of nondisability while ignoring evidence that points to a disability finding."[9] *Lewis*, 858 F.3d at 869. That evidence includes the only objective medical evidence available from the relevant period, and the very evidence that should have been accorded the most weight under the regulations based on Dr. Roberts's status as an examining physician, a treating physician, and a specialist in the relevant area of medicine. *See* 20 C.F.R. § 404.1527(c)(1), (2), (5); *see also id.* at (c)(2) ("If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."); SSR 96-2p, 1996 WL 374188, at \*4 (July 2, 1996) ("In many cases, a treating [physician's] medical opinion will be entitled to the greatest weight and should

---

[9] The ALJ made other errors in her recitation of the evidence. For example, the ALJ mistakenly asserts that the November 2009 x-ray was of Bilotta's left knee when it was actually of his right knee, and that Bilotta told Girmay that his pain rated only a three on a scale of one to ten when Bilotta actually said that his pain ranged from a three to a ten on a scale of one to ten.

be adopted, even if it does not meet the test for controlling weight."). The ALJ thus failed to "build an accurate and logical bridge from the evidence to [her] conclusions," and thereby lacked substantial evidence for her finding that Bilotta could perform medium work. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

In an effort to patch these holes in the ALJ's decision, the Commissioner points out that the ALJ relied on the non-examining agency consultants' review of Bilotta's medical records in concluding that he could perform medium work, and that those consultants both properly dated the x-rays and considered Roberts's 2010 treatment notes.[10] But the consultants too never mentioned Bilotta's obesity. Moreover, "a non-examining physician's opinion cannot, by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986).

A fair assessment of the record makes plain that in 2010, Bilotta simply wasn't capable of medium work. In late 2009, Bilotta described his knee pain to several examining agency consultants. To Dr. Girmay, Bilotta explained that the pain was constant and felt worse when he bended. Bilotta also told Bevis and Fiore that his knee prevented him from "standing or walking for more than a few minutes at a time" and from bending. A.R. 516. Such pain would have prevented Bilotta from performing medium work, which requires

---

[10] The Commissioner also directs us to evidence that Bilotta worked on a few occasions from 2014–2016, but this sheds no light on whether Bilotta could perform medium work in 2010.

standing or walking for six hours in an eight-hour workday and usually requires frequent bending.

In this circuit, if "an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability." *Hines v. Barnhart*, 453 F.3d 559, 564 (4th Cir. 2006). Bilotta's osteoarthritis in his knee is a "medically determinable impairment" that could reasonably be expected to produce his symptoms of pain. *See* 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016). Having established that condition, Bilotta is "entitled to rely exclusively on his subjective evidence" of that pain to support his claim of disability during the relevant period. *Hines*, 453 F.3d at 565.

Of course, if "[o]bjective medical evidence of pain, its intensity or degree" is available, it should also be considered. *Id.* at 564. Here, all of the objective medical evidence corroborates Bilotta's knee pain. Bilotta's obesity supports his descriptions of the severity of the pain. *See* SSR 02-1P, 2002 WL 34686281, at *6 ("[S]omeone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."). And in November 2009, Dr. Girmay noted that Bilotta walked with a normal gait, while Bevis and Fiore observed that Bilotta ambulated slowly due to his knee, which is consistent with Bilotta's description that his pain level varied.

The x-rays show that the condition of Bilotta's right knee deteriorated between November 2009 and February 2010, which suggests that the joint would have felt the same or worse by the time he reached the relevant period. The only objective medical evidence

18

from the relevant period—i.e., Dr. Roberts's 2010 treatment notes, which must be afforded the greatest weight—reveals that Bilotta walked with a limp favoring his right knee and had significant effusion and diffuse tenderness in that knee. This further substantiates Bilotta's description of his knee pain.

The record as a whole thus demonstrates that Bilotta's pain would have prevented him from bending frequently and being on his feet long enough to perform medium work. Instead, "the most" that Bilotta "c[ould] still do" during the relevant period would have been light or sedentary work. *Mascio*, 780 F.3d at 635.[11]

D.

This court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). We have previously "awarded disability benefits without remand where the record clearly establishes the claimant's entitlement to benefits and another ALJ hearing on remand would serve no useful purpose." *Arakas*, 983 F.3d at 111 (citing *Hines v. Barnhart*, 453 U.S. 559 (4th Cir. 2006); *Crider v. Harris*, 624 F.2d 15, 17 (4th Cir. 1980)).

---

[11] Bilotta alleges that the ALJ made several other errors in her analysis of residual functional capacity, such as stating that Bilotta didn't have a severe impairment, crediting Roberts over Girmay on the flexion in Bilotta's knees, and drawing adverse inferences because Bilotta sought treatment infrequently from 2010–2012. But because we don't need to consider these issues to conclude that Bilotta couldn't perform medium work, we decline to do so.

As the Commissioner concedes, if Bilotta was illiterate and limited to light work during the relevant period, he was disabled. *See* Resp. Br. at 32 n.9; 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.09 (providing that an individual 50–54 years old who is limited to light work and is illiterate is disabled). As we have explained, the record clearly establishes both, and therefore Bilotta's disability. Moreover, despite his meritorious claim, Bilotta has been waiting for his disability benefits for almost ten years, during which he has endured three ALJ hearings and was "forced to undergo costly litigation . . . solely because of the agency's errors." *Arakas*, 983 F.3d at 111. Because "remanding the case for yet another ALJ hearing would be not only pointless, but also unjust," *id.*, we instead award Bilotta his long overdue benefits.

\* \* \*

For these reasons, we reverse the district court's judgment. We remand the case to the district court with instructions to remand to the agency for a calculation of disability benefits.

*REVERSED AND REMANDED WITH INSTRUCTIONS*