**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-2415**

KIMBERLY TRIPLETT,

        Plaintiff − Appellant,

    v.

ANDREW SAUL, Commissioner of Social Security Administration,

        Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  M. Hannah Lauck, District Judge.  (3:19−cv−00104−MHL)

Argued:  March 9, 2021                     Decided:  June 23, 2021

Before DIAZ, THACKER, and HARRIS, Circuit Judges.

Vacated and remanded by unpublished per curiam opinion.

**ARGUED:**  Clifford Michael Farrell, MANRING & FARRELL, Columbus, Ohio, for Appellant.  Jonathan Tyler Lucier, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.  **ON BRIEF:**  G. Zachary Terwilliger, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Kimberly Triplett appeals the district court's order affirming the Social Security Administration's denial of her application for disability insurance benefits. Triplett contends that the administrative law judge ("ALJ") erred by (1) according little weight to three medical opinions, including her treating physician's opinion; and (2) concluding that two of the three opinions classified her impairments as not severe, when all three doctors opined that her impairments were severe.

We agree with Triplett that the ALJ erred by misreading the severity findings in two of the three medical opinions. The ALJ also erred by failing to consider each of the factors listed in 20 C.F.R. § 404.1527(c) before affording only negligible weight to Triplett's treating physician's medical opinion. Because these errors frustrate our judicial review, we vacate the district court's judgment and remand for further administrative proceedings.

I.

On February 27, 2015, Triplett applied for Social Security Disability Insurance benefits, alleging disability based on fibromyalgia[1] and chronic fatigue syndrome. Triplett alleged that her disability began on January 4, 2014. After the Social Security Administration denied Triplett's claim initially and upon reconsideration, Triplett

---

[1] Fibromyalgia is "a disorder of unknown cause characterized by chronic widespread soft-tissue pain particularly in the neck, shoulders, back, and hips, which is aggravated by use of the affected muscles and accompanied by weakness, fatigue, and sleep disturbances." *Arakas v. Comm'r*, 983 F.3d 83, 91 (4th Cir. 2020) (cleaned up).

requested and received a hearing before an ALJ. The ALJ denied Triplett's claim in a written decision, and the Appeals Council denied Triplett's request for review.

Triplett then filed suit in the United States District Court for the Eastern District of Virginia. She argued that "the ALJ erred by: (1) finding . . . that none of [Triplett's] medically determinable impairments qualified as severe; and, (2) making an inconsistent and confusing residual functional capacity . . . finding to justify her conclusion that [Triplett] did not suffer from any severe impairments." *Triplett v. Saul*, No. 3:19CV104 (MHL), 2019 WL 6122022, at *1 (E.D. Va. Aug. 15, 2019). Triplett also argued that the ALJ erred in failing to provide the required reasons for assigning less than controlling weight to her treating physician's opinion. A magistrate judge issued a report and recommendation, which recommended granting summary judgment to the agency and affirming its decision. *Id.*

Triplett filed an objection solely to the magistrate judge's holding affirming the ALJ's determination that "all of her medically determinable impairments were non-severe." *Triplett v. Saul*, No. 3:19CV104, 2019 WL 5190884, at *3 (E.D. Va. Oct. 15, 2019) (cleaned up). Triplett didn't raise any additional arguments before the district court. The district court overruled Triplett's objection, adopted the report and recommendation, and granted summary judgment to the agency. *Id.* at *1.

This appeal followed.

## II.

The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs use the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a)(4) to determine whether a claimant is disabled under the Act.

Step one requires the ALJ to determine whether the claimant has been working during the relevant period. § 404.1520(a)(4)(i). Step two asks whether the claimant's medically determinable impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). "An impairment . . . is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a); *See also Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) ("An impairment can be considered as not severe only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.") (cleaned up). To meet the duration requirement, the impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." § 404.1509. "If the claimant has been working, or if the claimant's impairments do not meet the severity and duration requirements, the ALJ must find the claimant not disabled." *Arakas*, 983 F.3d at 90.

4

At step three, the ALJ considers the medical severity of the claimant's impairments and determines whether they (1) are equivalent to the impairments listed in the regulations and (2) meet the duration requirement. § 404.1520(a)(4)(iii). If the claimant's impairments meet both requirements, the ALJ must find that the claimant is disabled. *Id.*

But if the step three analysis is inconclusive, the ALJ next considers the claimant's "residual functional capacity" and her "past relevant work." § 404.1520(a)(4)(iv). "To assess the claimant's Residual Functional Capacity, the ALJ must first identify the claimant's functional limitations or restrictions and assess the claimant's ability to do sustained work-related activities on a regular and continuing basis—*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule." *Arakas*, 983 F.3d at 90 (cleaned up). "After the Residual Functional Capacity assessment, the ALJ proceeds to step 4, which asks whether the claimant can still perform past relevant work despite the limitations identified." *Id.* If the answer is yes, then the claimant is not disabled. § 404.1520(a)(4)(iv).

If the claimant can't perform her past relevant work, the ALJ moves to step five and considers the claimant's residual functional capacity, age, education, and work experience to determine whether she can adjust to other work available in the national economy. § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* Though the claimant bears the burden of proof at the first four steps, the burden shifts to the Commissioner at step five, during which the ALJ typically relies on a vocational expert's testimony. *Arakas*, 983 F.3d at 90.

## III.

Triplett was 49 years old when she first applied for disability insurance benefits. She holds a graduate degree and worked for the entire relevant period as a vocational evaluator, a position which required her to drive throughout Virginia. She also regularly commuted between her home in Fredericksburg and her office in Richmond.

Due to her alleged disability, Triplett resigned from her position in January 2014 and hasn't worked since.

### A.

Triplett first complained of fatigue during a September 2013 appointment with Dr. Daniel Gray, her primary care physician, reporting that she began experiencing fatigue three years prior and also experienced "headache[s], muscle weakness and sleepiness" in conjunction with fatigue. A.R. 337. Triplett told Gray that her fatigue occurred intermittently and "at random," that she occasionally experienced "weakness in her upper body and neck," and that her symptoms improved "after she t[ook] a day or so off work and sle[pt] a lot." *Id.*

After a referral from Gray, Triplett sought treatment from Dr. Avnit Ahuja, a rheumatologist. During a June 2014 appointment, Ahuja determined that Triplett had normal range of motion and normal strength in her extremities. Ahuja provided Triplett information about Lyrica and Cymbalta, prescription medications used to treat fibromyalgia and chronic fatigue syndrome. But during a July 2014 follow-up appointment, Triplett expressed concerns about using these medications (due to their possible side effects) and stated that she treated her pain with Tylenol. Ahuja

6

recommended that Triplett use the pain reliever Tramadol-Acetaminophen ("Ultracet") to manage her symptoms and again noted that Triplett had normal range of motion and normal strength in her extremities.

Triplett next saw Ahuja in September 2014. She again exhibited normal strength and range of motion and reported that Ultracet helped her manage her symptoms. Triplett remained "[h]esitant . . . to use Cymbalta and Lyrica due to possible side effects," and Ahuja recommended that Triplett "[c]ontinue to exercise as tolerated." A.R. 297.

During a July 2015 appointment with Ahuja, Triplett reported that she "takes [T]ramadol every night now," "cannot tolerate more than 2 hours of activity a day," and requires 20 minutes "at times to get out of bed." A.R. 418. But Triplett also reported that she went to the gym three times a week, where she used a stationary bike and did "stren[g]th training and weights." *Id.* A month later, Triplett told Ahuja that she was "feeling better and doing well with [T]ramadol and would prefer not to add further medications." A.R. 456. Ahuja also found that Triplett continued to have normal range of motion and strength in her extremities. Ahuja sent his notes from Triplett's appointments with him to Dr. Gray.

Several non-treating consultants assessed Triplett's physical and mental limitations as part of the agency's consideration of her disability claim. Dr. Richard Surrusco reviewed Triplett's medical records during the initial review of her application for benefits. Surrusco found that Triplett wasn't disabled but was limited to sedentary work. He also found that Triplett had a severe medically determinable impairment and that her "statements about the intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence alone." A.R. 98. But

7

he opined that Triplett could stand or walk for a total of two hours and sit for a total of six hours in an eight-hour workday. And he answered "no" to questions asking whether Triplett had "postural," "manipulative," "visual," "communicative," or "environmental limitations." A.R. 99.

Dr. William Rutherford, Jr. evaluated Triplett's records as part of the reconsideration of her application for benefits. Rutherford similarly concluded that Triplett had a severe medically determinable impairment and was limited to sedentary work but wasn't disabled. Dr. Joseph Leizer, Ph.D. separately reviewed Triplett's records to assess her psychological condition and limitations, if any. He determined that Triplett had no severe mental impairments and concluded that, though Triplett complained of difficulty concentrating and focusing, "she is able to clean, do laundry, organize and help her son with homework." A.R. 109.

In April 2017, Triplett complained to her orthopedist of lower back pain following a fall. But her pain improved after she completed physical therapy. And by November 2017, Triplett had normal muscle tone, "painless range of motion with full flexion" in her torso, and "no pain with back extension." A.R. 689. During this appointment, Triplett didn't report taking either Ultracet or Tramadol, stating that she was then taking Lisinopril (a hypertension medication), Flonase (a seasonal allergy medication), Timolol (a glaucoma medication), and a multivitamin and iron supplement. *See* A.R. 688. She also reported that fatigue was "[n]ot [p]resent." A.R. 689.

Also in November 2017, Dr. Gray filled out a fibromyalgia residual function questionnaire, indicating that Triplett could bend and twist at the waist only occasionally.

8

Gray marked that Triplett wasn't limited in reaching, handling or fingering, but he also wrote that she could grasp, turn and twist objects only 50 percent of the time during a workday, finger only 50 percent of the time and reach for objects only 15 percent of the time. Gray stated that Triplett had a "fair" prognosis, but wrote that her fibromyalgia had lasted, or could be expected to last, at least twelve months. A.R. 671. Gray also opined that Triplett experienced chronic and widespread pain, which worsened with stress, fatigue, minimal activity, and changing weather.

Gray further opined that Triplett experienced several symptoms, including: multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, cognitive impairment, and numbness and tingling. Ultimately, Gray opined that Triplett couldn't work a full eight-hour workday and would need a job that allowed her to shift positions at will and lie down for unpredictable intervals during the workday. He estimated that Triplett would likely have to miss work more than three days per month.

B.

Before the ALJ, Triplett testified that she began her typical day by preparing her then eight-year-old son for school. Said Triplett, "I make sure he gets dressed, has his backpack[] packed, and then I walk him up the street[] to the bus stop and stay with him until he gets on the bus." A.R. 33. Triplett testified that she did laundry or other light housework in the morning and rested in the afternoon before getting her son off the bus. She went grocery shopping once a week, which tired her so much that it was the only activity she could do that day. In the evenings, Triplett helped her son with his homework

9

and took him to taekwondo practice, a five-minute drive from her house. Triplett also took her son to the movies and played games with him.[2]

In August 2017, Triplett traveled with her husband and son to Florida on vacation. Her husband drove the entire way in a single day, a trip which took 14 hours, including "a lot of breaks." A.R. 35. The vacation included a visit to Disney World, although she didn't say—and wasn't asked—how much time she spent there or which activities she engaged in. Her husband also drove for the entire return trip.

When asked why she didn't believe she could work, Triplett said:

> The symptoms that I have are on a daily basis. I'm in pain constantly and the more activity I have, the more pain, more fatigue, difficulty thinking, remembering, short-term memory gets impaired, and I have a lot of problems with the blood sugar dropping as well. And once I get fatigued, I have problems with vertigo. When I was working, I had to travel from Richmond to Fredericksburg every day, just to go back and forth to home, and when I was very fatigued, my blood sugar would drop and I would have to pull off and wait until I could get my blood sugar restabilized. So the – that really impacted my ability to function in my job. So all of that, together – that whole picture together is the reason why I can't work.

A.R. 37–38. Triplett explained that the best way for her to control her pain and other symptoms was by limiting her schedule. She could perform about two hours of activities each day, not counting time spent with her son, and would then need to rest to be able to help her son with homework and other activities. While she could drive, she did so only around Fredericksburg "because of the difficulty . . . for [her] to multitask and the fatigue . . . and the pain." A.R. 40. And Triplett testified that she would have a "bad day" three

---

[2] Triplett didn't testify, and wasn't asked, about which games she played with her son or whether any of them required physical exertion.

10

or four times a month, when she couldn't get out of bed because she experienced "severe vertigo, severe pain, [and] severe fatigue." A.R. 41.

Following Triplett's testimony, a vocational expert testified concerning Triplett's ability to work considering her age, education, past work, and impairments. The ALJ presented the vocational expert with two hypotheticals. In the first hypothetical, the ALJ asked:

> [A]ssume a person of the Claimant's age, education, and work experience with the residual functional capacity to perform sedentary work. The hypothetical individual is able to occasionally stoop, kneel, crouch, crawl or climb ramps, stairs, ladders, ropes, and scaffolds. Must avoid concentrated exposure to hazardous (sic) and noise. Would such a hypothetical individual be able to perform the Claimant's past work?

A.R. 49. The vocational expert answered yes. For the second hypothetical, the ALJ asked:

> [A]ssume a person of the Claimant's age, education, and work experience with the residual functional capacity, as indicated in hypothetical #1, but in addition, the hypothetical individual will be off task 15% of the day and or miss work, leave early or arrive late two days per month. . . . Would the hypothetical individual be able to perform the Claimant's past work?

*Id.* The vocational expert answered no and testified that the person in the second hypothetical couldn't perform "any other jobs." *Id.* The ALJ explained that she asked the vocational expert about the hypothetical individual being "off task and the missed work, based on the Claimant's testimony about the need for breaks during the day, as well as, the – I think she said about three really bad days per month." A.R. 50

C.

In her decision denying Triplett's claim at step two, the ALJ found that Triplett "does not have an impairment or combination of impairments that has significantly limited

11

(or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months." A.R. 18. The ALJ thus found that Triplett's impairments met neither the severity nor the duration requirements. The ALJ also found that Triplett had multiple medically determinable impairments, including "fibromyalgia/chronic fatigue kind syndrome." *Id.* And the ALJ found that Triplett's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." A.R. 19. But the ALJ determined that Triplett's testimony about the "intensity, persistence and limiting effects of [her] symptoms [was] not entirely consistent with the medical evidence and other evidence in the record." *Id.*

According to the ALJ, Triplett "received either brief, routine, conservative treatment, or, at times, more involved treatment, but in either case, there is no evidence that these impairments resulted in lasting sequelae." *Id.* The ALJ noted that Triplett reported in 2014 that treatment with Ultracet helped her manage her fibromyalgia symptoms and that "[s]he continued to report improvement with Ultracet and Tramadol throughout 2015." A.R. 20. The ALJ pointed out that Triplett "had maintained normal strength and range of motion, and she admitted that exercise helps her pain." *Id.* The ALJ also noted that Triplett "remained able to drive, do laundry, housecleaning, go grocery shopping, get her son up, ready for school, and on the bus, and she [was] able to help with homework and get him to Tae Kwon Do practice on time." *Id.*

The ALJ then described the state agency physicians' findings and limitation of Triplett to sedentary work. But she gave their opinions "little weight," because she believed them to be "internally inconsistent." A.R. 21. The ALJ deemed them inconsistent

because "[i]t was determined that [Triplett] did not have a severe impairment, but then she was reduced to sedentary exertion." *Id.*

The ALJ also pointed to an apparent inconsistency in Dr. Gray's opinion, stating: "Dr. Gray said the claimant has no significant limitations in reaching, handling, or fingering, but then states the claimant can perform bilateral handling 50%, bilateral fingering 50%, and bilateral reaching (including overhead) 15% each." *Id.* The ALJ then gave Dr. Gray's opinion "little to no weight, as the evidence does not support this level of limitation. The evidence supports relatively mild intermittent symptoms that resolve with routine treatment." *Id.* And, said the ALJ, no evidence in the record substantiated Gray's (or Triplett's) claim that Triplett would miss three or more days of work a month because of her symptoms.

Finally, the ALJ determined that, even if Triplett's impairments were severe, she would still not be disabled at step four, because Triplett could perform her previous or a similar job while restricted to sedentary activity. The ALJ based this finding on the vocational expert's testimony that, "with a reduction to less than sedentary work with the above-named limitations, [Triplett] could return to this past relevant work as generally performed." A.R. 22. The ALJ didn't address the second hypothetical, aside from her statement that she didn't credit Triplett's testimony (on which the hypothetical was based) concerning the intensity, persistence, and limiting effects of her symptoms.

IV.

We review a district court's grant of summary judgment de novo, "applying the same legal standards as the district court." *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012). In disability benefits cases, we "affirm the Social Security Administration's disability determination when [the] ALJ has applied correct legal standards and [her] factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (cleaned up). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).

"In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ." *Id.* (cleaned up). Rather, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." *Id.* (cleaned up). However, "we do not reflexively rubber-stamp an ALJ's findings." *Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017).

A.

Here, the ALJ misread the severity findings in Drs. Surrusco's and Rutherford's opinions and incorrectly deemed them internally inconsistent on that basis. Drs. Surrusco and Rutherford both found that Triplett suffered from a severe impairment that limited her to sedentary work, though both also found that she wasn't disabled and could continue to perform her former job. We thus hold that the ALJ erred in giving these opinions little weight based on a nonexistent internal inconsistency.

14

B.

The ALJ then compounded this error when she failed to consider all the factors in 20 C.F.R. § 404.1527(c) before assigning little to no weight to the opinion of Triplett's treating physician, Dr. Gray.[3]  This circuit observes the "treating physician rule," which "requires that ALJs give 'controlling weight' to a treating physician's opinion on the nature and severity of the claimant's impairment if that opinion is (1) 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and (2) 'not inconsistent with the other substantial evidence' in the record." *Arakas*, 983 F.3d at 106 (quoting 20 C.F.R. § 404.1527(c)(2)).  "By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

We have also explained how the ALJ is to assess a treating physician's opinion that is not controlling:

> [I]f a medical opinion is not entitled to controlling weight under the treating physician rule, an ALJ must consider each of the following factors to determine the weight the opinion should be afforded: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability, i.e., the extent to

---

[3] Triplett arguably waived any challenge to the ALJ's analysis of her treating physician's opinion by failing to raise it before the district court.  But the agency hasn't pressed waiver before us.  As we have observed, "the purpose of the waiver doctrine is to avoid unfairness to an appellee and minimize the risk of an improvident or ill-advised opinion being issued on an unbriefed issue." *Brown v. Nucor Corp.*, 785 F.3d 895, 920 (4th Cir. 2015) (cleaned up).  Because Triplett argued both before the magistrate judge and before us that the ALJ violated the treating physician rule, we find no prejudice to the Social Security Administration in excusing her waiver.

which the treating physician presents relevant evidence to support the medical opinion; (4) consistency, i.e., the extent to which the opinion is consistent with the evidence in the record; (5) the extent to which the treating physician is a specialist opining as to issues related to his or her area of specialty; and (6) any other factors raised by the parties which tend to support or contradict the medical opinion.

*Dowling v. Comm'r*, 986 F.3d 377, 384–85 (4th Cir. 2021) (cleaned up).

Here, substantial evidence supports the ALJ's decision not to give controlling weight to Dr. Gray's medical opinion. This is because a reasonable mind could conclude that Dr. Gray's opinion conflicts with other medical evidence in the record.

We briefly describe that evidence. Triplett's last appointment with Dr. Ahuja, her rheumatologist, was in August 2015, during which she reported that she was "feeling better and doing well with [T]ramadol and would prefer not to add further medications." A.R. 456. The record doesn't indicate any additional specialized treatment for fibromyalgia.

Triplett also declined to try Lyrica or Cymbalta, prescription medications frequently used to treat fibromyalgia symptoms, because she was concerned about possible side effects. Although these concerns were not entirely unfounded given that, in 2016, she suffered an allergic reaction to prescription pain medication, which landed her in the emergency room,[4] it also supports the ALJ's conclusion that, contrary to Dr. Gray's opinion, Triplett's "pain and fatigue is well controlled" with her then existing medication regimen. A.R. 20.

---

[4] Triplett went to the emergency room to seek treatment for an allergic reaction to Celebrex in March 2016. *See* A.R. 558. But as discussed above, she began expressing concerns over taking Lyrica and Cymbalta due to their possible side effects in 2014. The record doesn't indicate whether she had a history of allergic reactions to medications.

16

Triplett's daily activities also support the ALJ's conclusion that she wasn't as limited as Dr. Gray opined. As discussed above, Triplett got her son ready for school, took him to and picked him up from the bus stop, took him to taekwondo practice in the evenings, sometimes took him to the movies and played games with him, and was able to do various household chores and shop for groceries. Triplett also could drive (at least locally). And she went to the gym three times a week to exercise, as recommended by Dr. Ahuja. Her exercise routine involved strength training and weights. Finally, she was able to travel with her family to Disney World in August 2017.

On this record, "we accept the ALJ's conclusion that Dr. [Gray's] medical opinion was not entitled to controlling weight." *See Dowling,* 986 F.3d at 385. But "it does not follow that the ALJ had free reign to attach whatever weight to that opinion that [she] deemed fit." *Id.* Instead, "[t]he ALJ was required to consider each of the six 20 C.F.R. § 404.1527(c) factors before casting Dr. [Gray]'s opinion aside." *Id.* Here, as in *Dowling*, "[t]he ALJ plainly failed to do so." *Id.*

The ALJ afforded "little to no weight" to Dr. Gray's opinion because "[t]he evidence supports relatively mild intermittent symptoms that resolve with routine treatment." A.R. 21. This explanation, however, touches on only one of the § 404.1527(c) factors—supportability. True, the ALJ mentioned that Gray had seen Triplett for approximately five years and was her family physician. But the ALJ failed to explain whether she considered either the length or the nature of the treating relationship, as she was required to do under § 404.1527(c), before discounting Gray's opinion. And her analysis failed even to acknowledge the other three § 404.1527(c) factors.

17

"While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that [she] meaningfully considered *each* of the factors before deciding how much weight to give the opinion." *Dowling*, 986 F.3d at 385. Here, as in *Dowling*, it is not at all apparent that the ALJ considered, or was even aware of, all the § 404.1527(c) factors.

And just as in *Dowling*, we conclude that this error requires a remand. We note that the first two § 404.1527(c) factors arguably cut in Triplett's favor. Dr. Gray was Triplett's family physician, and he treated her for five years from July 2013, *see* A.R. 331–32, until November 2017, when he filled out the fibromyalgia residual function questionnaire, *see* A.R. 671. During that time, Gray saw Triplett eleven times, and several of these appointments were related to her fibromyalgia and chronic fatigue. *See, e.g.*, A.R. 337 (documenting a September 30, 2013 appointment during which Triplett reported "fatigue, headache, muscle weakness and sleepiness"); A.R. 348 (documenting a December 18, 2013 appointment during which Triplett sought treatment for sleep apnea but also reported "headache, non-restorative sleep, . . . fatigue, [and] muscle pain"); A.R. 358 (documenting a follow-up appointment concerning Triplett's fatigue during which Gray noted that Triplett's symptoms "have remained unchanged" and "are aggravated by exertion, lack of sleep and stress"). The ALJ's brief dismissal of Gray's opinion does not give us confidence that she considered, or even reviewed, any of these records.

In sum, the ALJ's failure to engage meaningfully with the § 404.1527(c) factors in dismissing Triplett's treating physician's opinion, combined with her error in the weight

she assigned to the non-treating agency consultants' testimony, frustrates our judicial review. *See Dowling*, 986 F.3d at 386 ("[I]t is an elemental principle of administrative law that agency determinations must be made in accordance with certain procedures that facilitate judicial review.") (cleaned up).

A remand is therefore in order.[5]

\* \* \*

For the foregoing reasons, we vacate the district court's judgment and remand the case to the district court with instructions that it remand to the agency for further administrative proceedings consistent with this opinion.

*VACATED AND REMANDED*

---

[5] Our opinion shouldn't be read to suggest any particular result on remand regarding whether Triplett is disabled.